LAWRENCE M. HADLEY - State Bar No. 157,728
lhadley@glaserweil.com
STEPHEN E. UNDERWOOD - State Bar No. 320,303
sunderwood@glaserweil.com
GLASER WEIL FINK HOWARD
   AVCHEN & SHAPIRO LLP
10250 Constellation Boulevard, 19th Floor
Los Angeles, California 90067
Telephone: (310) 553-3000
Facsimile: (310) 556-2920

LAWRENCE R. LAPORTE – State Bar No. 130,003
Lawrence.LaPorte@lewisbrisbois.com
LEWIS BRISBOIS BISGAARD & SMITH LLP
633 West 5th Street, Suite 4000
Los Angeles, California 90071
Telephone: 213.250.1800
Facsimile: 213.250.7900

Attorneys for Plaintiff
Core Optical Technologies, LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| CORE OPTICAL TECHNOLOGIES, LLC, | CASE NO: |
|---|---|
| Plaintiff, | **COMPLAINT FOR PATENT INFRINGEMENT** |
| v. | **JURY TRIAL DEMANDED** |
| CISCO SYSTEMS, INC. and DOES 1 through 10, inclusive, | |
| Defendants. | |

Plaintiff Core Optical Technologies, LLC ("Plaintiff" or "Core"), by and through its undersigned counsel, hereby files this Complaint against Defendants Cisco Systems, Inc. ("Cisco") and Does 1 through 10, inclusive ("Does") (collectively, "Defendants"). For its complaint, Core alleges as follows:

**THE PARTIES**

1.      Core is a limited liability company organized and existing under the laws of the State of California. Core has a principal place of business located at 18792 Via Palatino, Irvine, California 92603.

2.      Defendant Cisco is a corporation organized and existing under the laws of California. Cisco maintains its principal place of business at 170 West Tasman Dr., San Jose, California 95134.

3.      Defendants Does are: (i) customers and/or end-users of Cisco's fiber optic cross polarization interference cancelling devices; (ii) other end-users of Cisco's fiber optic cross polarization interference cancelling devices; (iii) persons, such as third-party vendors or contractors, who have assisted Cisco or the Doe Defendants in using Cisco's fiber optic cross polarization interference cancelling devices in a manner that infringes the Asserted Claims (as defined below); and/or (iv) other persons, all of whom have infringed the Asserted Claims, or who have assisted other Defendants in infringing the Asserted Claims, by or through their use of Cisco's fiber optic cross polarization interference cancelling devices.

4.      The true names and identities of the Doe Defendants are unknown at this time. Therefore, they are being sued under their fictitious names. At such time as their true names are ascertained, this Complaint will be amended to so reflect.

5.      On information and belief, each Doe Defendant has directly and/or indirectly infringed the Asserted Claims, either by themselves or in concert with other Defendants, by using Cisco's fiber optic cross polarization interference cancelling devices in the United States. Core reserves the right to amend this Complaint to identify the specific infringing acts of each Doe Defendant once it learns such facts. Core expect that most, or all, of such facts are non-public. Core expects to uncover such facts in discovery.

**JURISDICTION AND VENUE**

6.      This is an action for infringement of method claims, and *only* method

COMPLAINT FOR PATENT INFRINGEMENT

Glaser Weil

claims, of U.S. Patent No. 6,782,211, entitled "Cross Polarization Interface [sic] Canceler," which was duly issued by the United States Patent and Trademark Office on August 24, 2004 ("the '211 patent"). The asserted claims in this case are *only* method claims 30, 32, 33, 35 and 37 of the '211 patent ("the Asserted Claims").

7.      This Court has subject matter jurisdiction over this case under 28 U.S.C. §§ 1331 and 1338(a), because the claims arise under the patent laws of the United States, 35 U.S.C. §§ 1, *et seq*.

8.      This Court has general personal jurisdiction over each Defendant, because—on information and belief—each Defendant conducts continuous and systematic business in California, including, upon information and belief, in this judicial district. This Court also has general personal jurisdiction over each Defendant, because—on information and belief—each Defendant maintains a regular and established place of business in this district.

9.      This Court has general personal jurisdiction over Defendant Cisco because it maintains regular and established places of business in California, including its headquarters located at 170 West Tasman Dr., San Jose, California. Cisco also maintains regular and established places of business within this judicial district, including its offices located at: (i) 11111 Santa Monica Blvd., Suite 400, Los Angeles, California 90025; (ii) 121 Theory Drive, Suite 100, Irvine, California 92617; and (iii) 130 Theory Drive, Suite 100, Irvine, California 92617.

10.      This Court also has general personal jurisdiction over Defendant Cisco because, on information and belief, Cisco conducts continuous and systematic business within this judicial district.

11.      In addition, this Court has specific personal jurisdiction over each Defendant because, on information and belief, each Defendant has committed acts of infringement in California, and within this judicial district.

12.      This Court has specific personal jurisdiction over Defendant Cisco because, on information and belief, it has committed acts that infringe the Asserted

3

1886294

Claims in California, and in this judicial district. More specifically, on information and belief, Cisco has performed all of the steps of the Asserted Claims in California, and in this judicial district, either personally, through intermediaries, or in conjunction with one or more joint venturers or customers. Furthermore, on information and belief, Cisco has induced and/or contributed to customers' infringement of the Asserted Claims in California, and in this judicial district.

13. Venue is proper in this judicial district against each Defendant.

14. Venue is proper against Defendant Cisco because, on information and belief: (i) Cisco has regular and established places of business in this judicial district, including the places of business identified in Paragraph 9 *supra*; and (ii) Cisco has committed acts of infringement in this judicial district, including performing all of the steps of the method(s) claimed in the '211 Patent in this judicial district; and/or performing acts of contributory or induced infringement in this judicial district. *See* 28 U.S.C. § 1400(b).

15. In addition, venue is proper because Core resides in this judicial district, and Core has and continues to suffer harm in this judicial district. Moreover, a substantial part of the events giving rise to this action occurred in this judicial district, including the inventive activities giving rise to the '211 patent.

## THE ASSERTED PATENT

16. Mark Core, the sole named inventor of the '211 patent, earned his Ph.D. in electrical and computer engineering from the University of California, Irvine, and is the Manager of Core Optical Technologies, LLC. The pioneering technology set forth in the '211 patent greatly increases data transmission rates in fiber optic networks, by enabling two optical signals transmitted in the same frequency band, but at generally orthogonal polarizations, to be recovered at a receiver. The patented technology that enables the recovery of these signals includes coherent optical receivers and related methods that mitigate cross-polarization interference associated with the transmission of the signals through the fiber optic network. The coherent

Glaser Weil

1886294

receivers and their patented methods mitigate the effects of polarization dependent loss and dispersion effects that limit the performance of optical networks, greatly increasing the transmission distance and eliminating or reducing the need for a variety of conventional network equipment such as amplifiers, regenerators, and compensators. The patented technology set forth in the '211 patent has been adopted by Defendants in, at least, their packet-optical transport solutions described below.

17.     On November 5, 1998, Mark Core filed with the United States Patent and Trademark Office ("USPTO") Provisional Patent Application No. 60/107,123 ("the '123 application") directed to his pioneering inventions. On November 4, 1999, Mark Core filed with the USPTO a non-provisional patent application, U.S. Patent Application No. 09/434,213 ("the '213 application"), claiming priority to the '123 application. On August 24, 2004, the USPTO issued the '211 patent from the '213 application. The entire right, title, and interest in and to the '211 patent, including all rights to past damages, has been assigned to Core in an assignment recorded with the USPTO. The '211 patent is attached as Exhibit 1 to this Complaint.

18.     The Asserted Claims of the '211 patent are all method claims. One of these is claim 33, an independent method claim. Claim 33 is reproduced below, with parenthetical annotations to identify the different elements of the claim:

> 33. A method comprising:
>
> > (33a) receiving an optical signal over a single fiber optic transmission medium,
> >
> > > (33a1) the optical signal being at least two polarized field components independently modulated with independent information bearing waveforms; and
> >
> > (33b) mitigating cross polarization interference associated with the at least two modulated polarized field components to reconstruct the information bearing waveforms

COMPLAINT FOR PATENT INFRINGEMENT

Glaser Weil

1886294

(33b1) using a plurality of matrix coefficients being complex values to apply both amplitude scaling and phase shifting to the at least two modulated polarized field components.

**DEFENDANTS' CROSS POLARIZATION CANCELLING DEVICES**

19.    Defendants and/or their divisions, subsidiaries, and/or agents are engaged in the business of making, using, distributing, importing, offering for sale and/or selling devices that can be configured to mitigate and/or cancel cross polarization interference in received fiber optic signals. As so configured, the devices, when used, perform all the steps of the methods claimed in the Asserted Claims, during normal use. These devices include, but are not limited to: (i) the Network Convergence System ("NCS") 1000 Series, NCS 2000 Series, NCS 4000 Series, and ONS 15454 Series optical networking platforms (the "Platforms"); (ii) the Cisco modules, line cards, transponders, muxponders, and other equipment which are used with the Platforms to perform optical communication with polarization-division multiplexing ("PDM") and cross-polarization interference cancelling ("XPIC") (the "Modules"); and (iii) the software and firmware used to control and operate the Platforms and the Modules to perform optical communication with PDM and XPIC, including Cisco Transport Controller ("CTC") and IOS-XR software (the "Software") (collectively, "the Fiber Optic XPIC Devices").

20.    Each Fiber Optic XPIC Device is, or can be, configured to perform all of the steps recited in the Asserted Claims of the '211 Patent, during normal use. On information and belief, each Defendant has actually used the Fiber Optic XPIC Devices to perform each step of the methods recited in the Asserted Claims of the '211 Patent, within the United States, either itself, through intermediaries, or in conjunction with one or more joint venturers or customers.

21.    Cisco's product literature, website, and other publicly-available information shows that the Fiber Optic XPIC Devices, when used with appropriate

COMPLAINT FOR PATENT INFRINGEMENT

1886294

components, are configured to perform all of the steps of claim 33, during normal use.

22.     Element 33(a) recites "receiving an optical signal over a single fiber optic transmission medium." The Fiber Optic XPIC Devices are configured to do this, during normal operation.

23.     For instance, a datasheet for the NCS 4000 Series Platform (Exhibit 2) states that the NCS 4000 is a "converged *optical* service platform providing Dense Wavelength-Division Multiplexing (DWDM), Optical Transport Network (OTN), Multiprotocol Label Switching (MPLS), Carrier Ethernet, and Label Switch Router (LSR) or IP multiservice capabilities." Ex. 2 at 1. Thus, the NCS 4000 Platform sends and receives "optical" signals. The same is true of the other Platforms. *See* Exhibit 3 (NCS 2000 Series Datasheet) at 2 (stating that the NCS 2000 can be used to "creat[e] a unified *packet optical* transport system encompassing DWDM plus OTN and packet switching"); Exhibit 4 (NCS 1002 Datasheet) at 1 (stating that the NCS 1002 provides "maximum *optical* performance" with "DWDM" transport capability); Exhibit 5 (NCS 1004 Datasheet) at 5 (stating that the NCS 1004 provides "performance monitoring of *optical* parameters on the client and DWDM line interface including laser bias current, transmit *and receive optical* power"); Exhibit 6 (ONS 15454 M2 Datasheet) at 3 (stating that the ONS 15454 MSTP is an "*optical* transport platform.")

24.     The Fiber Optic XPIC Devices, in operation, are configured to receive optical signals over a "fiber optic transmission medium." *See* Ex. 2 at 1 (stating that the NCS 4000 has "16 service line-card slots," each of which accepts a "line card" that receives optical signals over fiber optic cables); Ex. 3 at 2 (stating that the NCS 2000 has multiple "slots for service cards," each of which receives optical signals over fiber optic cables); Ex. 4 at 1 (stating that the NCS 1002 has "8 CFP-2ACO based DWDM trunk ports," each of which receives optical signals over fiber optic cables); Ex. 5 at 1 (stating that the NCS 1004 has "four line card slots," each of which accepts a "line card" that receives optical signals over fiber optic cables); Ex. 6 at 1 (stating that the ONS 15454 M2 has "two slots for service cards," each of which

accepts a "line card" that receives optical signals over fiber optic cables).

25.     Thus, when properly configured and used, the Fiber Optic XPIC Devices "receiv[e] an optical signal over a single fiber optic transmission medium" during normal operation, as recited in element 33(a).

26.     Element 33(a1) recites "the optical signal being at least two polarized field components independently modulated with independent information bearing waveforms." Publicly-available evidence shows that the Fiber Optic XPIC Devices, when appropriately configured, perform this step during normal operation.

27.     The transmission or reception of optical signals with "at least two polarized field components independently modulated with independent information bearing waveforms" is called "Polarization-Division Multiplexed" ("PDM") optical communication. Publicly-available evidence shows that the Fiber Optic XPIC Devices, when appropriately configured, perform PDM optical communication during normal use.

28.     For instance, the NCS 4000 datasheet states that the NCS 4000 provides "DWDM [i.e., Dense Wavelength-Division Multiplexing] functions," including "100 Gbps **CP-DQPSK** … WDM interfaces." Ex. 2 at 12 (emphasis added). Cisco uses the term "CP-DQPSK" to mean "coherent ***polarization-multiplexing*** differential quadrature phase shift keying (CP-DQPSK) modulation." Ex. 7 (ONS 15454 100-Gbps CP-DQPSK Full C-Band Tunable DWDM Card datasheet) at 1 (emphasis added). Thus, when used with appropriate components, and configured properly, the NCS 4000 Platforms use PDM optical communication, as recited in element 33(a1).

29.     Similarly, the NCS 2000 includes multiple slots for "service cards." Ex. 3 at 2. Several of the service cards that can be used with the NCS 2000 use PDM optical communication. These include: (i) the NCS 2000 100-Gbps Coherent DWDM Trunk Card with CPAK Client Interface, which uses "CP-DQPSK modulation" (Ex. 8 (100-Gbps Trunk Card Datasheet) at 1); (ii) the NCS 2000 200-Gbps Multirate DWDM Line Card, which uses three different types of "coherent polarization-

Glaser Weil

1886294

multiplexed" modulation (Ex. 9 (200-Gbps Multirate Line Card Datasheet) at 1); (iii) the NCS 2000 400 Gbps XPonder Line Card, which uses three different types of "CP"—i.e., coherent PDM—modulation (Ex. 10 (400 Gbps Xponder Line Card datasheet) at 12); and (iv) the ONS 15454 100Gbps Trunk Card, which is compatible with the NCS 2000 Series (*see* Ex. 7 at 11), and which uses "coherent polarization-multiplexing differential quadrature phase shift keying (CP-DQPSK) modulation." *Id.* at 1. Thus, when used with appropriate components, and configured properly, the NCS 2000 Platforms use PDM optical communication, as recited in element 33(a1), during normal use.

30.    Similarly, the NCS 1000 Series uses PDM optical communication. *See* Ex. 4 at 1 (stating that the NCS 1002 uses three different types of "coherent polarization-multiplexed" modulation); Ex. 5 at 8 (stating that the NCS 1004 uses various types of "PM" – i.e., polarization multiplexed – communication). Thus, when used with appropriate components, and configured properly, the NCS 1000 Platforms use PDM optical communication, as recited in element 33(a1), during normal use.

31.    Accordingly, when used with appropriate components and configured properly, the Fiber Optic XPIC Devices receive an "optical signal being at least two polarized field components independently modulated with independent information bearing waveforms," as recited in element 33(a1), during normal use.

32.    Element 33(b) recites "mitigating cross polarization interference associated with the at least two modulated polarized field components to reconstruct the information bearing waveforms." Publicly-available evidence shows that the Fiber Optic XPIC Devices, when configured properly and used with appropriate components, perform this step during normal use.

33.    For instance, the 2013 Cisco Presentation "Optical Transport (DWDM) Evolution and Developments" (Ex. 11) describes Cisco's "CP-DQPSK" modulation techniques – i.e., the techniques used in the Fiber Optic XPIC Devices to perform PDM optical communication. *See* Ex. 11 at 28-32. The presentation states that the

Fiber Optic XPIC Devices have coherent optical receivers that perform "[a]dvanced signal processing to address: CD [chromatic dispersion] compensation; PMD [polarization mode dispersion] mitigation; [and] Single Channel Non-linear impairment mitigation." *Id.* at 28. The Presentation shows the structure of the coherent optical receiver as follows (*id.* at 29):



34.     As seen above, the coherent optical receiver in the Fiber Optic XPIC Devices splits received optical signals into two orthogonal polarizations; passes each to a 90 degree hybrid mixer; mixes the received signal components with the components of a local oscillator ("Laser") reference signal; detects the in-phase and quadrature components of the received optical signal at the two orthogonal polarizations (i.e., $i_0$, $q_0$, $i_1$, $q_1$); passes the detected signals to four Analog-to-Digital Converters (ADCs); and then performs "Signal Processing" on the detected signals. The signal processing includes "[c]alculat[ing] the Inverse Optical System Matrix" of the transmission path, to "Recover[ the] Polarisation" of the transmitted signal. Ex. 11 at 29. This process of calculating the inverse of the optical system matrix, to recover the polarization of the transmitted signal, comprises "mitigating cross polarization interference associated with the at least two modulated polarized field components to reconstruct the information bearing waveforms," as recited in element 33(b).

35.     Similarly, the Datasheet for the ONS 15454 100G Trunk Card shows that that card uses the same coherent optical receiver structure shown in the presentation:

Glaser Weil

1886294

Ex. 7 at 4. This confirms that the coherent optical receivers in the Fiber Optic XPIC Devices are configured to satisfy element 33(b) in normal operation.

36.     Thus, the publicly-available evidence shows that the Fiber Optic XPIC Devices, when appropriately configured and used with the appropriate components, are configured to satisfy element 33(b), during normal use.

37.     Element 33(b1) recites "using a plurality of matrix coefficients being complex values to apply both amplitude scaling and phase shifting to the at least two modulated polarized field components." Publicly-available evidence shows that the Fiber Optic XPIC Devices, when properly configured and used with appropriate components, perform this step during normal use.

38.     As shown in Paragraphs 32-36 *supra*, publicly-available evidence shows that the coherent optical receivers in the Fiber Optic XPIC Devices perform "signal processing" that includes "calculat[ing] the ***Inverse Optical System Matrix***," to "Recover[ the] Polarisation" of the transmitted signal. Ex. 11 at 29. Thus, the Fiber Optic XPIC Devices apply a "plurality of matrix coefficients" to the "at least two modulated polarized field components," as recited in element 33(b1).

39.     Moreover, the matrix coefficients which the Fiber Optic XPIC Devices apply to the "modulated polarized field components" are ***necessarily*** "complex values." In general, when an optical signal propagates along a transmission medium – such as a fiber optic cable – the medium affects both the amplitude and phase of the signal. The cumulative effects of the medium can be expressed in a matrix, which Cisco calls the "Optical System Matrix." *Id.*  To fully account for the effects of the medium, the coefficients in this matrix must be ***complex***, such that the real parts of the coefficients account for the amplitude-effects of the medium, and the imaginary parts of the coefficients account for the phase-effects of the medium.

40.     Cisco's documents indicate that the Fiber Optic XPIC Devices compute the "inverse" of the "Optical System Matrix," and apply that inverse to the received

COMPLAINT FOR PATENT INFRINGEMENT

1886294

signals to recover the originally-transmitted signals. *Id.* Since the Optical System Matrix must have complex coefficients, the inverse of that Matrix – which is applied to the received signals – must also have complex coefficients. Thus, the Fiber Optic XPIC Devices apply "a plurality of matrix coefficients being complex values" to the received optical signals, as recited in element 33(b1).

41.     Finally, the Fiber Optic XPIC Devices "apply both amplitude scaling and phase shifting," as recited in the claim. As discussed above, to fully account for the effects of the transmission medium, and "Recover [the] Polarisation" of the original signals, the "Inverse Optical System Matrix" must use *complex* coefficients. Such coefficients *necessarily* perform both "amplitude scaling" and "phase shifting" to the received signal components, as recited in element 33(b1)

42.     Accordingly, publicly-available evidence shows that the Fiber Optic XPIC Devices, when configured properly and used with the appropriate components, are configured to perform all of the elements of claim 33, during normal use.

<u>Marking – 35 U.S.C. § 287(a)</u>

43.     Core has never made, sold, used, offered to sell, or imported into the United States any article that practices any claim of the '211 Patent. Core has never sold, commercially performed, or offered to commercially perform any service that practices any claim of the '211 Patent.

44.     Prior to October 21, 2014, Core had never authorized, licensed, or in any way permitted any third party to practice any claim of the '211 Patent.

45.     Moreover, Core alleges that Defendants infringe *only* method claims of the '211 patent. Core does not allege that Defendants infringe any apparatus claims of the '211 patent. The marking requirement of 35 U.S.C. § 287(a) does not apply when a patentee only asserts infringement of method claims. *See Crown Packaging Tech., Inc. v. Rexam Beverage Can Co*., 559 F.3d 1308, 1316 (Fed. Cir. 2009); *Hanson v. Alpine Valley Ski Area, Inc*., 718 F.2d 1075, 1082-83 (Fed. Cir. 1983).

46.     Because Core has never directly marketed any product or service that

practices any of the claimed inventions of the '211 Patent, and no third party was authorized to practice any claimed inventions of the '211 patent prior to October 21, 2014, 35 U.S.C. § 287(a) cannot prevent or otherwise limit Core's entitlement to damages for acts of infringement that occurred prior to October 21, 2014.

47.     Because Core alleges that Defendants infringe only method claims of the '211 patent, 35 U.S.C. § 287(a) does not apply, even for acts of infringement that occurred after October 21, 2014. Thus, 35 U.S.C. § 287(a) does not limit Core's entitlement to damages against Defendants, in any way, for any period of time.

## COUNT I – DIRECT PATENT INFRINGEMENT (35 U.S.C § 271(a))

48.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1-47 above, as if fully set forth herein.

49.     Defendants have made, used, offered for sale, and/or sold, directly and/or through intermediaries, in this judicial district and/or elsewhere in the United States, one or more of the Fiber Optic XPIC Devices, and/or imported into the United States one or more of the Fiber Optic XPIC Devices.

50.     Defendants' acts complained of herein, including their use of the Fiber Optic XPIC Devices, directly infringes the Asserted Claims, because—as shown in Paragraphs 19-42 *supra* (for claim 33)—the Fiber Optic XPIC Devices are configured to perform all of the steps recited in those claims, during normal use.

51.     Defendants have directly infringed the Asserted Claims of the '211 Patent by performing all of the steps of those claims within the U.S., either themselves, through intermediaries, or in conjunction with joint venturers and/or customers. Specifically, on information and belief, Defendants have performed all of the steps recited in each Asserted Claim, either personally, through intermediaries, or in conjunction with joint venturers and/or customers, by operating the Fiber Optic XPIC Devices within the U.S.. Such operation necessarily performs all of the steps recited in those claims, as shown in Paragraphs 19-42 *supra* (for claim 33).

1886294

**COUNT II – INDUCEMENT OF INFRINGEMENT (35 U.S.C § 271(b))**

52.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1-51 *supra*, as if fully set forth herein.

53.     Defendants have actively induced infringement of the Asserted Claims of the '211 Patent, in violation of 35 U.S.C. § 271(b).

54.     Defendants have actively induced infringement of these claims by selling the Fiber Optic XPIC Devices to one or more customers in the U.S., along with documentation and instructions demonstrating how to use the devices to infringe the claims, and/or by providing service, maintenance, support, or other active assistance to their customers in using the Fiber Optic XPIC Devices in the U.S. The documentation which Defendants have provided includes, at least: (i) the product information for the Fiber Optic XPIC Devices set forth on Defendants' websites, including https://www.cisco.com/ , which includes the various white papers, manuals, datasheets, and other technical documentation for the Fiber Optic XPIC Devices provided on Defendants' websites; (ii) the specific instances of Defendants' product documentation which are attached as Exhibits to this Complaint, or which are otherwise referenced in this Complaint; and (iii) the other product documentation which, on information and belief, Defendants provide in electronic and/or paper form to their customers for the Fiber Optic XPIC Devices.

55.     For instance, Cisco's website publishes detailed technical support, installation and configuration information for the Fiber Optic XPIC Devices. These include "Configuration Guides," "Install and Upgrade Guides," "Command References," "Technical References," "Data Sheets," and other documents. *See* https://www.cisco.com/c/en/us/support/optical-networking/network-convergence-system-4000-series/tsd-products-support-series-home.html (Support page for the NCS 4000 Series); https://www.cisco.com/c/en/us/support/optical-networking/network-convergence-system-2000-series/tsd-products-support-series-home.html (Support page for the NCS 2000 Series); https://www.cisco.com/c/en/us/support/optical-

networking/network-convergence-system-1000-series/tsd-products-support-series-home.html (Support page for the NCS 1000 Series);

https://www.cisco.com/c/en/us/support/optical-networking/ons-15454-sonet-multiservice-provisioning-platform-mspp/model.html (Support page for ONS 15454).

56.     On information and belief, the foregoing technical documentation on Cisco's website, along with other information Cisco provides to its customers, specifically instructs customers on how to select, install, configure and operate the Fiber Optic XPIC Devices in order to practice the Asserted Claims.

57.     On information and belief, Cisco has also provided other product documentation, training, support, advertisement and/or other communications or materials to end-users, apart from the materials specifically referenced in this Complaint, which were intended to induce, and which did induce, end-users to infringe the Asserted Claims. Core expects that many such materials are non-public. Core expects that it will uncover such materials through discovery in this case. Core reserves the right to amend this Complaint to identify such additional materials as they are uncovered through discovery, to the maximum extent permitted by law.

58.     As shown in Paragraphs 19-42 *supra*, when Defendants' customers use the Fiber Optic XPIC Devices in the U.S., such use meets all of the elements recited in the Asserted Claims. Thus, Defendants have committed affirmative acts (i.e., selling the Fiber Optic XPIC Devices, providing documentation on how to use the Fiber Optic XPIC Devices, and/or providing service, maintenance, technical support, or other active assistance to their customers) which have resulted in direct infringement of the '211 Patent by their customers in the United States.

59.     On information and belief, and for the following reasons, Defendants had actual knowledge of the existence and relevance of the '211 Patent, or were willfully blind to its existence and relevance, prior to the filing of the Complaint.

60.     For example, on information and belief, Defendants knew of the '211 Patent's existence and relevance due to Core's filing of complaints for infringement

1886294

of that patent in: (1) Central District of California Case No. SACV 12-1872 AG, styled *Core Optical Technologies, LLC v. Ciena Corporation, et al*. (filed October 29, 2012); (2) Central District of California Case No. SACV 16-0437 AG, styled *Core Optical Technologies, LLC v. Fujitsu Network Communications, Inc*. (filed March 7, 2016); and (3) Central District of California Case No. SACV 8:17-cv-00548AG, styled *Core Optical Technologies, LLC v. Infinera Corp*. (filed March 24, 2017).

61.    On information and belief, as a major player in the optical networking industry, Cisco monitors patent lawsuits against other players in the industry. On information and belief, through such monitoring, Cisco knew of—or was willfully blind to—the existence of the '211 Patent, due to Core's three prior lawsuits against other industry players. Through such monitoring, Cisco knew—or was willfully blind—that its Fiber Optic XPIC Devices infringe the '211 Patent during normal use.

62.    Moreover, Cisco knew of the existence and relevance of the '211 Patent—or was willfully blind to its existence and relevance—through its own patent prosecution activities.

63.    Cisco applied for, and received, U.S. Patent No. 9,515,745 ("the '745 patent"), titled "Adaptive Equalization in Coherent Receivers using a Stokes Space Update Algorithm." A copy of the '745 patent is attached as Exhibit 12. The application for the '745 patent was filed on March 6, 2014 – nearly a decade after the '211 patent issued – and the '745 patent issued on December 6, 2016.

64.    The '745 patent covers technology directly related to the '211 patent. Like the '211 patent, the '745 patent describes a "coherent optical receiver," which receives optical signals having a "first polarization" and a "second polarization" – i.e., polarization-multiplexed signals. *See* Ex. 12, Abstract. It further describes, and claims, an "adaptive butterfly equalizer" which "performs polarization de-multiplexing and dynamic compensation of polarization effects (e.g., polarization mode dispersion (PDM) and polarization dependent loss (PDL))." *Id.* at 1:11-21. This "adaptive butterfly equalizer" can be constructed as "four equalizers 210, 220, 230,

240 arranged in a butterfly configuration," as shown in Figure 2, reproduced below:



65.

66.     The equalizer structure shown in Fig. 2 of the '745 patent, *supra*, is essentially the same XPIC filter configuration depicted in Fig. 4A of the '211 patent. Thus, the alleged "invention" in the '745 patent is directly related to Core's invention, which Core disclosed over a decade earlier in the '211 patent.

67.     On October 22, 2015, the Examiner issued a First Office Action in the '745 prosecution. *See* Exh. 13 (10/22/2015 Office Action). In the Office Action, the Examiner identified thirteen prior art references that were "pertinent to applicant's disclosure," and made those references "of record" in the prosecution. *Id.* at 13-15. One of those references was ***the '211 patent***. *Id.* at 15. The '211 patent is now listed on the face of the '745 patent as a "reference cited" by the Examiner.

68.     Accordingly, as of October 22, 2015—when the '211 patent was cited as prior art against a Cisco patent on directly-related technology—Cisco knew, or was willfully blind, that the '211 patent existed, and that it was highly relevant to Cisco's Fiber Optic XPIC Devices.

69.     In view of the foregoing, at all relevant times, Defendants have known about the existence and relevance of the '211 patent, and have known that the operation of the Fiber Optic XPIC Devices, when properly configured and used with appropriate components, infringes the Asserted Claims during normal use.

COMPLAINT FOR PATENT INFRINGEMENT

1886294

70.     On information and belief, when Defendants sold the Fiber Optic XPIC Devices to U.S. customers, and/or provided service, maintenance, technical support, or other active assistance to such customers, they did so with the specific intent to encourage the customers to perform acts constituting direct infringement of the '211 Patent. This is evidenced by Paragraphs 59-69 *supra*, which show that Defendants were aware of the existence and relevance of the '211 patent at all relevant times. Because Defendants were aware of the '211 patent's relevance and existence, they always knew – based on information and belief – that their customers' use of the Fiber Optic XPIC Devices would constitute infringement of that patent. Defendants' decision to continue marketing the Fiber Optic XPIC Devices to U.S. customers, despite knowing that such customers' use would constitute direct infringement, evidences that Defendants had a specific intent to encourage direct infringement of the '211 patent by its customers.

71.     Therefore, Defendants have unlawfully induced infringement of the '211 Patent, in violation of 35 U.S.C. § 271(b).

**COUNT III – CONTRIBUTORY INFRINGEMENT (35 U.S.C. § 271(c))**

72.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1-71 *supra*, as if fully set forth herein.

73.     Defendants have committed contributory infringement of the Asserted Claims of the '211 Patent, in violation of 35 U.S.C. § 271(c).

74.     Defendants have committed contributory infringement by selling, offering to sell and/or importing into the United States the Fiber Optic XPIC Devices. As shown in Paragraphs 19-42 *supra,* the Fiber Optic XPIC Devices contain components—including the coherent optical receivers, and accompanying electronics, in the "interface cards" or "line cards"—which, as configured, perform cross-polarization interference mitigation on polarization-multiplexed optical signals during use. These components, when used as configured during normal operation, practice the inventions claimed in the Asserted Claims.

COMPLAINT FOR PATENT INFRINGEMENT

Glaser Weil

1886294

75.     The components of the Fiber Optic XPIC Devices that can be used to mitigate cross-polarization interference practice a material part of the Asserted Claims, because they perform one of the key inventive functions of the '211 Patent – i.e., they mitigate the effects of cross-polarization interference, using matrix operations, to reconstruct the original polarization-division-multiplexed signals.

76.     On information and belief, prior to the filing of the Complaint, Defendants had actual knowledge, or were willfully blind, that these components of the Fiber Optic XPIC Devices were especially made or adapted for use in a manner that infringes the Asserted Claims of the '211 Patent. As shown in Paragraphs 59-69 *supra*, Defendants knew, or were willfully blind, that the Fiber Optic XPIC Devices are configured to infringe the '211 Patent upon use, at least because of Core's prior litigations against others in the optical networking industry, and because of the prosecution history of Cisco's '745 patent, in which the '211 Patent was cited as prior art. For the reasons set forth in Paragraphs 59-69, and on information and belief, Defendants knew, or were willfully blind, that normal use of the Fiber Optic XPIC Devices infringes the Asserted Claims of the '211 Patent. Despite that knowledge (or willful blindness), Defendants actively sold the Fiber Optic XPIC Devices in the United States, knowing that their customers would use the Fiber Optic XPIC Devices in the United States, and knowing (or being willfully blind) that such use would constitute direct infringement of the Asserted Claims.

77.     The components of the Fiber Optic XPIC Devices that are configured to perform cross-polarization interference mitigation, including the portions of the "signal processor" in the coherent optical receiver that compute the "inverse of the optical system matrix" (Ex. 7 at 4), are not staple articles of commerce, and—as configured to perform cross-polarization interference mitigation during normal operation—are not capable of substantial noninfringing use. To the contrary, these components, as configured, are ***especially adapted*** to perform the claimed cross-polarization interference mitigation methods, during normal use. *Id.*

1886294

78.     For example, the Fiber Optic XPIC Devices include the NCS 1002 and NCS 1004 Platforms. Based on the Datasheets for these Platforms, they **always** operate in polarization-division multiplexed mode. Ex. 4 at 1 (listing three available "modulation formats" for the NCS 1002, all which are "coherent polarization-multiplexed" formats); Ex. 5 at 3 (listing eleven available "modulation schemes" for the NCS 1004, all which of are "PM" (polarization multiplexed) formats). Similarly, the Datasheets for the NCS 2000 100-Gbps Coherent DWDM Trunk Card, the NCS 2000 200-Gbps Multirate DWDM Line Card, the NCS 2000 400 Gbps XPonder Line Card, and the ONS 15454 100Gbps Trunk Card indicate that these cards **always** operate in polarization-division multiplexed mode. *See* Ex. 8 at 3; Ex. 9 at 1; Ex. 10 at 3; Ex. 7 at 3-4.

79.     As shown in Paragraphs 19-42 *supra*, when one of the Fiber Optic XPIC Devices is configured to operate in polarization-division multiplexed mode, it **necessarily** infringes the Asserted Claims. Thus, because the Fiber Optic XPIC Devices listed in Paragraph 78 *supra* always operate in polarization-division multiplexed mode, when they are properly configured, they have no non-infringing uses. Accordingly, at the very least, the Fiber Optic XPIC Devices listed in Paragraph 78 *supra* are not capable of substantial non-infringing use.

80.     On information and belief, there are additional platforms, line cards, interface cards, transceivers, or other components in the Fiber Optic XPIC Devices that lack substantial non-infringing uses. Core expects that much of the information about these components is non-public. Core expects that, through discovery, it may uncover additional evidence regarding components of the Fiber Optic XPIC Devices that, as configured, are incapable of substantial non-infringing use. Core reserves the right to amend this Complaint to identify such additional components as they are uncovered in discovery, to the maximum extent permitted by law.

81.     Accordingly, Defendants have unlawfully contributed to infringement of the '211 Patent, in violation of 35 U.S.C. § 271(c).

**<u>REMEDIES, ENHANCED DAMAGES, EXCEPTIONAL CASE</u>**

82.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1-81 *supra*, as if fully set forth herein.

83.     Defendants' direct infringement (Count I), induced infringement (Count II), and contributory infringement (Count III) of the '211 patent has caused, and will continue to cause, significant damage to Core. As a result, Core is entitled to an award of damages adequate to compensate it for Defendants' infringement, but in no event less than a reasonable royalty pursuant to 35 U.S.C. § 284. Core is also entitled to recover prejudgment interest, post-judgment interest, and costs.

84.     For at least the reasons set forth in Paragraphs 59-69 *supra*, prior to the filing of this Complaint, Defendants knew (or were willfully blind) that the Fiber Optic XPIC Devices are configured to infringe the Asserted Claims of the '211 Patent, during normal use. Despite this known, objectively-high risk that its actions constituted direct and indirect infringement, Defendants continued to directly and indirectly infringe the '211 patent, up to the filing of this Complaint. Accordingly, Defendants' infringement has been (and is) willful.

85.     In addition to being willful, Defendants' conduct has been egregious.

86.     As set forth in Paragraphs 59-69 *supra*, despite knowing of (or being willfully blind to) their infringement, Defendants continued to infringe, on a large scale, up to the very date when the '211 patent expired. Cisco is a massive company, with over $50 billion in annual revenue.[1] Meanwhile, Plaintiff is a small company, owned by an individual inventor. On information and belief, Defendants persisted in their willful infringement, at least in part, because they believed they could use their superior resources to overwhelm Plaintiff in litigation. If proven, this would constitute "egregious" conduct, warranting enhanced damages.

---

[1] *See* https://www.statista.com/statistics/271853/worldwide-net-sales-of-cisco-systems-since-2006/.

1886294

87.     Moreover, the validity of the '211 patent has been twice confirmed by the Patent Trial and Appeal Board ("PTAB"), in: (i) IPR2016-01618, filed by Fujitsu Network Communications, Inc.; and (ii) IPR2018-01259, filed by Infinera Corporation. In both *Inter Partes* Review proceedings, the Petitioners—who were defendants in the prior litigations—cited numerous prior art references, to attempt to establish that claims of the '211 patent, including the Asserted Claims, were invalid. Yet, in both cases, the PTAB **denied** institution, finding that the Petitioners had failed to establish a "reasonable likelihood" that **any** claim of the '211 patent was invalid. *See* Ex. 14 (decision denying review in IPR2016-01618); Ex. 15 (decision denying review in IPR2018-01259). Because the PTAB has already rejected two extensive invalidity challenges to the '211 patent, Defendants cannot reasonably believe that they have a viable invalidity defense. Defendants' decision to persist in known, clearly-infringing conduct, despite the lack of any viable invalidity defense, is further evidence of "egregiousness," warranting an award of enhanced damages.

88.     For at least the foregoing reasons, Defendants' conduct has been willful and egregious. Accordingly, under 35 U.S.C. § 284, the Court should enhance Core's damages in this case by up to three times the amount found or assessed.

89.     For at least the foregoing reasons, this case is an "exceptional" case within the meaning of 35 U.S.C. § 285. Accordingly, Core is entitled to an award of attorneys' fees and costs, and the Court should award such fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Core prays for relief as follows:

1.     That judgment be entered in favor of Core, and against Defendants;

2.     That Core be awarded damages adequate to compensate it for Defendants' infringement of the Asserted Claims of the '211 Patent, in an amount to be determined at trial, as well as interest thereon;

3.     That Core be awarded the costs of suit;

4.     That Defendants' infringement be declared willful and egregious;

1886294

5.      That the Court increase Core's damages up to three times the amount assessed under 35 U.S.C. § 284;

5.      That the Court declare this an exceptional case under 35 U.S.C. § 285, and award Core its attorneys' fees and costs incurred in this action; and

6.      That the Court grant such further relief as it deems just and proper.

## JURY TRIAL DEMAND

Core demands a jury trial on all issues so triable.

DATED:  August 7, 2020

GLASER WEIL FINK HOWARD
   AVCHEN & SHAPIRO LLP


By:   /s/Lawrence M. Hadley
     LAWRENCE M. HADLEY
     STEPHEN E. UNDERWOOD

LAWRENCE R. LAPORTE,
LEWIS BRISBOIS BISGAARD & SMITH
LLP

   Attorneys for Plaintiff
   Core Optical Technologies, LLC

1886294