1   David P. Enzminger (SBN: 137065)
2   denzminger@winston.com
    **WINSTON & STRAWN LLP**
3   333 South Grand Avenue, 38th Floor
    Los Angeles, CA  90071-1543
4   Telephone: (213) 615-1700
    Facsimile: (213) 615-1750

John D. Haynes (*pro hac vice*)
john.haynes@alston.com
**Alston & Bird LLP**
1201 West Peachtree Street
Atlanta, GA 30309
Telephone: 404-881-7000
Facsimile: 404-881-7777

5   Krishnan Padmanabhan (SBN: 254220)
6   kpadmanabhan@winston.com
    **WINSTON & STRAWN LLP**
7   200 Park Avenue
    New York, NY 10166
8   Telephone: (212) 294-6700
    Facsimile: (212) 294-4700

*Attorney for Nokia Defendants*

9   *Attorney for Cisco Systems, Inc. and*
10  *ADVA Defendants*

11  *(Additional counsel information omitted)*

12

13              **UNITED STATES DISTRICT COURT**

14              **CENTRAL DISTRICT OF CALIFORNIA**

15                  **LOS ANGELES DIVISION**

16  CORE OPTICAL TECHNOLOGIES,
    LLC,
17                                          Case No. 8:20-cv-1468-JAK-RAO
                                            Case No. 8:19-cv-2190-JAK-RAO
18          Plaintiff,                      Case No. 8:20-cv-1463-JAK-RAO

19      v.                                  Assigned to Hon. John A. Kronstadt

20  CISCO SYSTEMS, INC. and DOES 1          **DEFENDANTS' NOTICE OF**
    through 10, inclusive,                  **MOTION AND MOTION FOR**
                                            **SUMMARY JUDGMENT**
21  NOKIA CORPORATION and
22  NOKIA OF AMERICA                        Date: December 6, 2021
    CORPORATION; and                       Time: 8:30 a.m.
23                                          Courtroom: 10B
    ADVA OPTICAL NETWORKING
24  SE and ADVA OPTICAL
    NETWORKING NORTH AMERICA,
25  INC.

26          Defendants.

27          **REDACTED VERSION OF DOCUMENT PROPOSED TO BE**
28                  **FILED UNDER SEAL**

## NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

**PLEASE TAKE NOTICE** that on December 6, 2021, or as soon thereafter as this matter may be heard in Courtroom 10B before the Honorable John A. Kronstadt, of the above-entitled Court located at First Street Courthouse, 350 W. First Street, Los Angeles, CA 90012, defendants Cisco Systems, Inc. ("Cisco"), ADVA Optical Networking North America, Inc. ("ADVA"), Nokia Corporation ("Nokia Corp."), and Nokia of America Corporation ("Nokia America," with Nokia Corp., "Nokia") (all collectively "Defendants") will and hereby do move the Court for an order granting summary judgment for Defendants on all causes of action and dismissing this case and the related cases with prejudice.

Defendants move for summary judgment under Federal Rule of Civil Procedure 56. The undisputed facts show that plaintiff Core Optical Technologies, LLC has no legitimate ownership interest in the sole asserted patent and thus lacks standing to sue for infringement. This dispositive fact compels dismissal.

Defendants' motion is based on this notice of motion and motion and the accompanying memorandum of points and authorities, the statement of uncontroverted facts and conclusions of law, the concurrently filed supporting declarations and exhibits attached thereto, the pleadings and papers on file here, and any further materials and argument presented to the Court at the time of the hearing.

This Motion is made following the conference of counsel on August 31, 2021 held pursuant to Local Rule 7-3.

Dated: September 7, 2021

/s/ *David P. Enzminger*

David P. Enzminger (SBN 137065)
denzminger@winston.com
**Winston & Strawn LLP**
333 S. Grand Ave.
Los Angeles, CA 90071
Telephone: 213-615-1700
Facsimile: 213-615-1750

Krishnan Padmanabhan (SB: 254220)
kpadmanabhan@winston.com
**Winston & Strawn LLP**

1

200 Park Avenue
New York, NY 10166
Telephone: (212) 294-6700
Facsimile: (212) 294-4700

Robert N. Kang (SBN: 274389)
rkang@winston.com
**Winston & Strawn LLP**
101 California Street, Suite 3500
San Francisco, CA 94111
Telephone:   (415) 591-1000
Facsimile:    (415) 591-1400

Michael French (Pro Hac Vice)
mfrench@winston.com
**Winston & Strawn LLP**
800 Capitol Street, Suite 2400
Houston, TX 77002
Telephone: (713) 651-2600
Facsimile: (713) 651-2700

***Attorneys for Defendants Cisco Systems, Inc. and ADVA Defendants***

/s/ *Thomas W. Davison*
John D. Haynes (admitted *pro hac vice*)
john.haynes@alston.com
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, GA 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7777

Thomas W. Davison (admitted *pro hac vice*)
tom.davison@alston.com
ALSTON & BIRD LLP
950 F Street, NW
Washington, DC 20004
Telephone: (202) 239-3300
Facsimile: (202) 239-3333

H. James Abe (State Bar No. 265534)
james.abe@alston.com
ALSTON & BIRD LLP
333 South Hope Street, 16th Floor
Los Angeles, CA  90071
Telephone: (213) 576-1000
Facsimile: (213) 576-1100

***Attorneys for Defendants Nokia Corp. and Nokia of America Corp.***

# **<u>TABLE OF CONTENTS</u>**

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ............................................. 1

I.   INTRODUCTION ........................................................................................ 1

II.  FACTUAL BACKGROUND ...................................................................... 2

    A.   Core Worked at TRW Throughout the 1990s and Assigned TRW His Inventions. .......................................................................................... 2

    B.   Core Participated in TRW's Fully-Funded Fellowship Program. .................. 4

    C.   Core Worked on Cross Polarization Interference Cancellation at TRW and then Researched the Same Topic for His Doctorate Work. ................... 5

    D.   Core Filed His Patents While Working on Cross Polarization Interference Cancellation at TRW. ........................................................... 7

    E.   The Invention of the '211 Patent Is an Optical Version of the TRW Cross Polarization Interference Canceller. ...................................... 8

    F.   TRW Was Heavily Invested in Optical Communication Technologies. ....... 10

    G.   Dr. Core Sought to Commercialize the '211 Patent by Recruiting TRW Personnel and Touting His Work at TRW. ......................................... 11

    H.   Core Optical Asked Northrop Grumman to Acknowledge Core Optical as the Owner. Northrop Refused. ............................................ 11

III.  LEGAL STANDARD ................................................................................ 12

    A.   Summary Judgment ........................................................................... 12

    B.   Patent Ownership and Assignment ...................................................... 13

IV.  ARGUMENT .............................................................................................. 13

    A.   Core Automatically Assigned the '211 Patent to Northrop Grumman (TRW's Successor). ............................................................................. 15

    B.   Neither Exception to Automatic Assignment Applies. ................................ 16

        1.   Reserved Inventions .................................................................. 16

        2.   Non-TRW Inventions. ............................................................... 16

            a.   Core developed the invention on TRW's time. ............................. 17

            b.   Core undisputedly used TRW's funding—*i.e.*, supplies—in developing the invention. ......................................................... 19

            c.   The invention relates directly to TRW's business and its research and development. .......................................................... 20

d. The invention resulted from Core's work for TRW. ....................22

C. Additional Evidence Confirms Northrop Owns the '211 Patent. ...............24

V. CONCLUSION ..................................................................................25

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NOS. 8:20-CV-1468-JAK-RAO; 8:19-CV-2190-JAK-RAO; 8:19-CV-2190-JAK-RAO

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..................................................................................... 12

*Arachnid, Inc. v. Merit Indus., Inc.*,
939 F.2d 1574 (Fed. Cir. 1991) ................................................................... 13

*Cadence Design Systems, Inc. v. Bhandari*,
2007 WL 3343085 (N.D. Cal. Nov. 8, 2007).............................. 17, 21, 22

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)..................................................................................... 13

*Core Optical Techs., LLC. v. Ciena Corp. et al.*,
No. 8:12-cv-01872 (C.D. Cal.) ................................................................... 11

*Core Optical Techs., LLC v. Fujitsu Network Commc'ns, Inc.*,
No. 8:16-cv-00437-AG-JPR (C.D. Cal.) .................................................... 11

*Core Optical Techs., LLC v. Infinera Corp.*,
No. 8:17-cv-00548-AG-JPR (C.D. Cal.) .................................................... 11

*Cubic Corp. v. Marty*
(1986) 185 Cal.App.3d 438 ........................................................... 18, 19, 20

*DDB Techs., L.L.C. v. MLB Advanced Media, L.P.*,
517 F.3d 1284 (Fed. Cir. 2008) ........................................................... 13, 15

*Dimming v. Workmen's Comp. Appeals Bd.*
(1972) 6 Cal.3d 860 ......................................................................... 19, 20

*Dominion Assets LLC v. Masimo Corp.*, No
2014 WL 2937058 (N.D. Cal. June 27, 2014) ........................................... 13

*Filmtec Corp. v. Allied-Signal, Inc.*,
939 F.2d 1568 (Fed. Cir. 1991) ........................................................... 13, 15

*General Elec. Co. v. Wilkins*,
2011 WL 1740420 (E.D. Cal. May 5, 2011)............................................... 24

*Imatec v. Apple Comput., Inc.*,
    15 F. App'x 887 (Fed. Cir. 2001) ...................................................... 16, 17

*Jim Arnold Corp. v. Hydrotech Sys., Inc.*,
    109 F.3d 1567 (Fed. Cir. 1997) ............................................................ 17

*Lans v. Dig. Equip. Corp.*,
    252 F.3d 1320 (Fed. Cir. 2001) ...................................................... 13, 17

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)........................................................................ 12, 13

*Preston v. Marathon Oil Co.*,
    684 F.3d 1276 (Fed. Cir. 2012) ............................................................ 15

*Regents Of Univ. Of N.M. v. Knight*,
    321 F.3d 1111 (Fed. Cir. 2003) ............................................................ 13

**Statutes**

Cal. Labor Code § 2870 ............................................................................ 17

Cal. Labor Code § 2870(a) ....................................................................... 17

**Other Authorities**

Fed. R. Civ. P. 56(a) ................................................................................ 12

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Over the past decade, Core Optical has been asserting a patent that it does not own. Core Optical, and its principal Dr. Mark Core ("Core"), have settled each of its three earlier cases before the court addressed standing. There is a reason for this. The facts are clear that Core Optical does not own the '211 patent and lacks standing to sue.

Core was an engineer at TRW, Inc., an aerospace, defense, and commercial electronics company, starting in 1990. Upon starting his employment at TRW, Core signed an agreement assigning TRW (now, Northrop Grumman) his "entire right, title, and interest in all INVENTIONS" that "relate[d] to the business or activities of TRW."

At TRW, Core researched, designed, and implemented systems related to TRW's cross polarization interference cancellation technology—the very technology in dispute here. Indeed, several colleagues lauded his contributions to TRW's work in this field. From 1993 through 1999, TRW paid Core to participate in TRW's all-expenses-paid Fellowship Program to pursue his doctoral degree. TRW offered this opportunity to engineers, like Core, to pursue advanced degrees in a field related to their work at TRW, which had to approve the course of study. Fellowship participants remained salaried employees of TRW and worked a reduced schedule to accommodate their educational pursuits. TRW provided a stipend to offset any loss of income and to support their education. Through his participation in TRW's Fellowship Program, Core earned his Ph.D. from U.C. Irvine in 1999 after defending his dissertation, entitled "Cross Polarization Interference Cancellation for Coherent Fiber Optics." Core admits that TRW funded this doctoral research that resulted in U.S. Patent No. 6,782,211 (the "'211 patent"), entitled "Cross Polarization Interference Canceler." Core filed a provisional application that was "essentially identical to [his] dissertation," and a non-provisional application, in November 1998 and 1999 respectively, while still employed at TRW. Core did not disclose either patent application to TRW.

Core developed the claimed technology of the '211 patent on TRW's time, on TRW's dollar, and that resulted form his work at TRW, and was related to TRW's business. Consequently, Core assigned the invention of the '211 patent to TRW through his invention agreement, and Northrop Grumman (TRW's successor)—not Core Optical—owns the '211 patent. Core Optical thus lacks standing to sue and the Court should accordingly dismiss these cases.

## II.     FACTUAL BACKGROUND

### A.     Core Worked at TRW Throughout the 1990s and Assigned TRW His Inventions.

TRW was an aerospace company in Southern California, with a campus in Redondo Beach.[1] SUF No. 1 (McGuire Decl. ¶ 3). Core was one of several thousand employees working at TRW's Redondo Beach campus, which was called "Space Park." SUF No. 2 (McGuire Decl. ¶¶ 3–4). Core worked as a digital design and high-speed logic design engineer at Space Park for 10 years, from August 1990 through August 2000. SUF No. 3 (McGuire Decl. ¶ 4; Core Tr. at 20:13–20). Northrop Grumman acquired TRW and its patent-ownership rights and assets in 2002. SUF No. 4 (Northrup-TRW Article; ▮▮▮▮▮▮▮▮▮▮).

TRW required its employees to sign an invention agreement as a condition of employment. SUF No. 5 (McGuire Decl. ¶ 5). Core was no exception and signed his invention agreement ("Agreement") in August 1990. SUF No. 6 (Invention Agreement, COREOPT0007678; Core Tr. at 34:20–35:4, 35:15–18). In the Agreement, Core assigned TRW his "entire right, title, and interest in all INVENTIONS" that "relate[d] to the business or activities of TRW" whether or not the inventions were disclosed to TRW. SUF No. 7 (Invention Agreement, COREOPT0007678, ¶ 2). The Agreement defined "INVENTIONS" as "any invention, innovation, discovery, computer program, process, trade secret, technique, or the like." SUF No. 8 (Invention Agreement,

---

[1] Certain of the buildings on the TRW campus had a Manhattan Beach address. Manhattan Beach neighbors Redondo Beach.

COREOPT0007678, ¶ 1).

There were two exceptions. Core could keep certain inventions for himself: (a) "Reserved Invenions" and (b) "Non-TRW Invenions." SUF No. 9 (Invention

> 1. **Disclosure of Inventions.** I shall promptly disclose, in writing, to TRW all pertinent information relating to any invention, innovation, discovery, computer program, process, trade secret, technique, or the like (hereafter "INVENTION"), whether or not patentable, conceived, developed, or reduced to practice by me, either individually or jointly with others, at any time during my term of employment with TRW, including Inventions specified in Paragraph 9, and I shall assist in the prosecution of any patent application and the enforcement or realization by TRW of any patent, right, or interest covering INVENTIONS assigned to TRW.
>
> 2. **Assignment of Inventions.** Except those inventions reserved pursuant to Paragraph 8 and those specified in Paragraph 9, I shall and do hereby assign to TRW my entire right, title, and interest in all INVENTIONS referred to in Paragraph 1 which relate to the business or activities of TRW, whether or not disclosed as herein provided.

Agreement, COREOPT0007678, ¶¶ 2, 8–9). Reserved Inventions were those that Core owned before starting at TRW, if he disclosed them in the Agreement. SUF No. 10 (Invention Agreement, COREOPT0007678, ¶ 8). Core disclosed a single reserved invention—"for a portable stereo FM transmitter"—that is not at issue here. SUF No. 11-12 (Invention Agreement, COREOPT0007678, ¶ 8, at 2).

The "Non-TRW Inventions" exception allowed an employee to retain ownership of an invention created during his TRW tenure ***only if*** very specific criteria were met: (1) "no equipment, supplies, facility, or trade secret information of TRW was used" to create the invention; (2) the invention was "developed entirely on [Core's] own time"; and (3a) the invention "d[id] not relate to the business of TRW" or "to TRW's actual or demonstrably anticipated research and development" or (3b) the invention "d[id] not result from any work performed by [Core] for TRW." SUF No. 13 (Invention Agreement, COREOPT0007678, ¶ 9). It reads:

> 9. **Non-TRW Inventions.** I understand that this Agreement does not require me to assign to TRW my rights to an INVENTION for which no equipment, supplies, facility, or trade secret information of TRW was used and which was developed entirely on my own time, and (a) which does not relate (1) to the business of TRW or (2) to TRW's actual or demonstrably anticipated research or development, or (b) which does not result from any work performed by me for TRW. Nevertheless, I shall disclose to TRW those INVENTIONS referred to in this paragraph 9 to enable TRW to determine if it has an interest therein.

The Agreement also required that Core "promptly disclose, in writing, to TRW

*all* pertinent information relating" to any invention "conceived, developed, or reduced to practice … at any time during [Core's] term of employment with TRW," including any "Non-TRW Inventions." SUF No. 14 (Invention Agreement, COREOPT-0007678, ¶¶ 1, 9). The disclosure requirement allowed TRW to evaluate whether TRW owned the rights to any potential invention under the Agreement, and to provide TRW the opportunity to file a patent application on the invention. SUF No. 15 (McGuire Decl. ¶ 6; Core Tr. at 47:22–48:3; COREOPT0007678, ¶ 9). The process for disclosing potential inventions was well publicized at TRW, with human resources personnel and others available to guide engineers through it and with TRW providing its employees a standard disclosure form. SUF Nos. 16–18 (McGuire Decl. ¶ 6). TRW employees were further obligated to "assist in the prosecution of any patent application… covering INVENTIONS assigned to TRW." SUF No. 19 (Invention Agreement, COREOPT0007678, ¶ 1).

### B.    Core Participated in TRW's Fully-Funded Fellowship Program.

TRW offered certain employee-engineers a fully-funded fellowship opportunity to pursue an advanced degree in a specific engineering field related to their work at TRW. SUF No. 20 (McGuire Decl. ¶¶ 7–8). TRW required the course of study, including any doctoral research, to be related to the employee's work for TRW. SUF No. 21 (McGuire Decl. ¶ 8). The program benefited both its participants and TRW. *See* SUF Nos. 22–26, 28 (McGuire Decl. ¶ 7; Core Tr. at 72:5–23, 73:22–75:17). The participants received a fully paid advanced education. *See* SUF Nos. 20, 22 (McGuire Decl. ¶¶ 7–8; Core Tr. at 73:22–75:17). TRW paid the employees' tuition and fees and reimbursed the student for the cost of books and supplies. SUF No. 22 (McGuire Decl. ¶ 7; Core Tr. at 73:22–75:17). Fellowship participants remained salaried TRW employees during their employment, although they worked fewer hours at TRW. SUF No. 23 (McGuire Decl. ¶ 7). But to compensate for the reduced income and to support their educational pursuits, TRW also provided a stipend to supplement the employee's income. SUF No. 25 (McGuire Decl. ¶ 7; Core Tr. at 75:10–17).

TRW benefitted from the engineering knowledge the participants gained in their graduate education. SUF No. 26 (McGuire Decl. ¶ 9). Fellowship participants were expected to contribute at TRW using their newly gained education and were required to stay with the company for one year after receiving their degree. SUF No. 27 (McGuire Decl. ¶ 7; Core Tr. at 72:5–23). TRW considered any work performed by participants during their fellowships, including doctoral research, to be work performed for TRW and on TRW's time, because TRW funded the student's graduate education. SUF No. 28 (McGuire Decl. ¶ 9). The program was thus an investment from TRW—it financed an education that would pay itself back when students contributed using their newly developed knowledge. SUF No. 29 (McGuire Decl. ¶¶ 7, 9).

Core participated in this Fellowship Program. SUF No. 30 (Core Tr. at 69:17–70:6). And as with other participants, TRW paid Core's entire tuition and additional fees. SUF No. 31 (Core Tr. at 69:17–70:6, 75:7–17, 96:23–97:4). During this time, Core was still a salaried employee at TRW, though on a reduced work schedule, and received the additional benefits of full-time employment at TRW, such as medical insurance. SUF Nos. 24, 33 (McGuire Decl. ¶ 7; Core Tr. at 70:25–71:9, 75:10–17). Core also received a stipend to help supplement his income while he pursued his education. SUF No. 34 (Core Tr. at 70:25–71:9, 75:10–17).

Through the Fellowship Program, Core began a doctoral program in electrical engineering at the University of California, Irvine in 1993. SUF No. 35 (Unofficial Transcript, UCI0051, at 0051; Registrar Response, UCI0025). He concluded his studies with his 1999 dissertation titled "Cross Polarization Interference Cancellation for Coherent Fiber Optics." SUF No. 36 (Dissertation, COREOPT0044690, at 44692). In his acknowledgement, Core "thank[ed] TRW for providing the fellowship program" and his TRW employees "for their support in making this work possible." SUF No. 37 (Dissertation, COREOPT0044690, at 44702).

**C.    Core Worked on Cross Polarization Interference Cancellation at TRW and then Researched the Same Topic for His Doctorate Work.**

Core's work at TRW on cross polarization interference cancellation continued in parallel with his graduate research on the same topic at U.C. Irvine. At TRW, Core worked on cross polarization interference cancellation alongside project lead Keith Yamashiro, Core's department manager Pascal Finkenbeiner, and Tom J. Kolze, among others. SUF No. 38 (Yamashiro Decl. ¶¶ 4, 7–11; NGC_0000012, at 0012; CIS-COREOPTICAL-00011349, at 11349, 11357; NGC_0000046; Core Tr. at 49:8–9, 100:1–23). Those three engineers authored a 1994 article titled "Advanced Signal Processing System for Demodulation, Equalization and Crosspol Optimization of GBPS Data Streams" that detailed TRW's development of communications system, including the design and implementation of TRW's "Cross Polarization Cancellor [sic] (CPC)." SUF No. 39 (Kolze Article, CIS-COREOPTICAL-00011349, at 1350, Fig. 1).[2] The authors specifically "recognize[d] the contributions" of Core "who participated in the unit designs, system integration, and system tests." SUF No. 41 (Kolze Article, CIS-COREOPTICAL-00011349, at 1357). Core's contributions to this project predated his patent applications that led to the '211 patent. SUF No. 42 (Core Tr. at 105:24–106:4). Core acknowledged that he was responsible for designing the portions of the system that "compute[d] the control signals for an adaptive equalizer and a crosspol canceller." SUF No. 43 (Core Tr. at 20:21–21:2, 22:19–23:17). Core's work on cross polarization interference cancellation at TRW was performed in support of TRW's internal research and development efforts. SUF No. 44 (Core Tr. at 33:8–11, 83:4–84:5; UCI0112, at 0112). Core had never worked on cross polarization interference cancellation before joining TRW. SUF No. 45 (Core Tr. at 20:4–7).

Core's direct TRW supervisor highlighted Core's work on the cross polarization interference canceller in his letter of recommendation to U.C. Irvine, writing that "Mark was ***directly responsible*** for implementing a cross polarization interference cancellation system." SUF No. 46 (UCI0114, at 0115) (emphasis added). Another TRW engineer,

---

[2] "Crosspol" is an abbreviation for "cross polarization." SUF No. 40 (Core Tr. at 23:14–17).

Greg Shreve, also recommended Core, noting that for a "Cross-Polarization Canceller (CPC)" project, Core "used a clear analytical approach to the signal processing algorithm design and implementation." SUF No. 47 (UCI0112, at 0112).

TRW's work on cross polarization interference cancellation continued through the 1990s, and Core participated in this work in conjunction with his doctoral research. SUF No. 48 (Yamashiro Decl. ¶¶ 6–11; CIS-COREOPTICAL-00011349, at 1357; NGC_0000012; NGC_0000025; NGC_0000046). In 1995, TRW applied for a patent related to the system it developed using cross polarization interference cancellation, and in 1997 that patent issued. SUF Nos. 52–53 (Yamashiro Decl. ¶ 9; U.S. Patent 5,692,014). In 1998, TRW recognized the work of Core's team on cross polarization interference cancellation with the TRW's Chairman's Award—a company-wide award for technological contributions that were important to TRW's business. SUF No. 54 (Yamashiro Decl. ¶ 10; NGC_0000012, at 0012, 0015, 0019 (referring to cross polarization interference canceller)). Core filed his provisional patent application less than five months later without advising TRW. SUF No. 55 (*compare* NGC_0000012 *with* Provisional Application, COREOPT0001428; '211 patent), 64-67.

**D.     Core Filed His Patents While Working on Cross Polarization Interference Cancellation at TRW.**

While still employed by TRW, working on TRW's cross polarization interference cancellation projects, and simultaneously pursuing doctoral research on the same subject—Core filed provisional application 60/107,123 on November 5, 1998 and non-provisional application 09/434,213 on November 4, 1999, which issued as the '211 patent on August 24, 2004. SUF Nos. 57–59 ('211 patent; Provisional Application, COREOPT0001428).[3] Core admits that "[t]he provisional patent application is essentially identical to [his] dissertation." SUF No. 61 (Core Tr. at 53:9–17, 178:10–15). Core never disclosed either the provisional or non-provisional patent applications,

---

[3] Dr. Core worked on his patent application beginning in at least October 1998. SUF No. 60 (Core Optical Privilege Log at entries 1, 2, and 3).

or his intent to file any patent application, to his manager at TRW, anyone in TRW's human resources or legal departments, or anyone else in his management chain to satisfy his duty to "promptly disclose, in writing … all pertinent information relating to any invention" during his employment, therefore depriving TRW of its ability to "determine if it had an interest therein." SUF Nos. 64–70 (Invention Agreement, COREOPT0007678, ¶¶ 1, 9; Core Tr. at 39:25–41:3, 48:10–53:22, 57:2–14, 177:15–179:22).

**E.     The Invention of the ′211 Patent Is an Optical Version of the TRW Cross Polarization Interference Canceller.**

The claims of the ′211 patent simply recite a modified version of the same cross polarization interference cancellation receiver that Mark Core worked on at TRW that simply substitutes optical signals that traverse fiber optic cables for radio frequency signals transmitted across free space. For example, asserted claim 30 recites:

> 30. A method comprising:
> receiving an optical signal over a single fiber optic transmission medium, the optical signal being one or more polarized field components independently modulated with independent information bearing waveforms; and processing the optical signal by (i) separating the optical field of the optical signal into orthogonally polarized field components, (ii) routing each of the orthogonally polarized field components to a coherent optical receiver to produce a first output and a second output, and (iii) transmitting the first and second outputs to a cross polarization interference canceller (XPIC).

SUF No. 78 (′211 patent at claim 30).

Core admitted that the TRW system, shown in the figure below, carried out these steps on radio frequency ("RF" or microwave) signals.



First, Core admitted that the received signal in the TRW system was two ***polarized components independently modulated with independent information bearing waveforms***, as required by claim 30. SUF No. 79 (Core Tr. at 125:15–18, 127:5–130:3; COREOPT00010653, at 0661). Core also admitted that, on the receiver side, the received signal is processed by ***separating the signal into orthogonally polarized components***, as required by claim 30. SUF No. 80 (Core Tr. at 127:5–130:3; *see also* Yamashiro Decl. ¶ 6). And critically, the TRW system transmitted the orthogonally polarized components ***to a cross polarization interference canceller***, which TRW called the "crosspol cancellor [sic]," and abbreviated "CPC" (and later "CPIC"). SUF No. 82 (Core Tr. at 129:16–19, 83:11–24; Yamashiro Decl. ¶ 6). The same functionality was confirmed by the TRW engineer that led the cross polarization interference cancellation project. *See* SUF Nos. 80–82 (Yamashiro Decl. ¶ 6).

Twenty years ago, Core told Lucent, a global telecommunications company, that the systems he built at TRW were essentially the same as his invention, but with RF components replaced by optical components. In May of 2000, while still employed at TRW, Core sent a paper to Charles B. Roxlo of Lucent to gauge Lucent's potential interest in helping to commercialize the invention of the '211 patent. SUF Nos. 71, 74–

75 (Core Tr. at 173:16–177:8, 198:9–16, 206:13–207:16; COREOPT0017642, at 7644, 7646). Figure 2c of that paper mirrors the embodiment shown in Figure 6 of the '211 patent. SUF No. 78 (Core Tr. at 204:8–12; *compare* '211 patent at Fig. 6 *with* COREOPT0017642, at 7647). To assure Lucent of the feasibility of the '211 patent, Core explained that his invention was the same as his TRW work, except" that the "optical front end is replaced by orthogonally polarized antennas and low noise amplifiers":

> I have built microwave cross polarization interference cancelers for satellite links at work, so the XPIC concept has been proven.  These systems were essentially figure 2c, except that the optical front-end is replaced by orthogonally polarized antennas and low noise amplifiers.

SUF No. 76 (COREOPT0017642, at 7644, 7647; Core Tr. at 201:25–204:17, 208:1–11). Both Core's work at TRW and his invention in the '211 patent could perform cross polarization interference cancellation on a RF signal. *See* SUF Nos. 84–86 ('211 patent, 10:27–33 (disclosing an embodiment that converts the received optical signal to a RF signal prior to processing by the XPIC); Core Tr. at 251:20–256:18). Core admitted that the '211 patent encompassed an XPIC that would be unable to discriminate between a signal that originated as an optical and a signal that originated as RF. SUF No. 86 (Core Tr. at 256:1–5, 256:15–18).

**F.    TRW Was Heavily Invested in Optical Communication Technologies.**

In addition to cross polarization interference cancellation technologies, TRW was deeply invested in optical communication technologies, including technologies related to fiber optic communications. SUF No. 88 (Oki Decl. ¶ 3). During the 1990s—the same period in which Core was pursuing his research, filing his patent applications, and seeking to commercialize his invention, all while still employed at TRW—TRW was developing optical transmitters and receivers for 10 Gigabit and 40 Gigabit optical communications. SUF No. 89 (Oki Decl. ¶¶ 4–6). Issues of fiber dispersion and

interference, to which Dr. Core's '211 patent is directed, were important aspects of TRW's development efforts. SUF Nos. 90–91 (Oki Decl. ¶ 6; '211 patent at 1:10–19). And TRW regularly pursued, and obtained, patents related to optical communication technologies. SUF No. 92 (U.S. Patent Nos. 6,366,356, 6,441,938, 6,490,068, 6,512,618, 6,545,785).

### G.     Dr. Core Sought to Commercialize the '211 Patent by Recruiting TRW Personnel and Touting His Work at TRW.

In his final days at TRW, and after his departure, Core sought to commercialize the '211 patent through a startup entity called Optiplex (also called Opnetix). SUF No. 71 (Core Tr. at 173:16–177:8). Core recruited Derek Kubo, a TRW colleague who also worked on cross polarization interference cancellation at TRW and is described in TRW's documents as ███████████████████████████████████ ███████████████████████████████████████████ to join Optiplex. SUF Nos. 72–73 (Core Tr. at 217:18–218:4; COREOPT0010625, at 0628; Yamashiro Decl. ¶ 11). Core relied on his experience working on cross polarization interference cancellation at TRW to tell potential funders that "***the XPIC concept has been proven***."   SUF No. 75 (COREOPT0017642, at 7644) (emphasis added).

### H.     Core Optical Asked Northrop Grumman to Acknowledge Core Optical as the Owner. Northrop Refused.

Core Optical previously sued several optical networking equipment vendors alleging infringement of the '211 patent. *See, e.g., Core Optical Techs., LLC. v. Ciena Corp. et al.*, No. 8:12-cv-01872 (C.D. Cal.); *Core Optical Techs., LLC v. Fujitsu Network Commc'ns, Inc.*, No. 8:16-cv-00437-AG-JPR (C.D. Cal.); *Core Optical Techs., LLC v. Infinera Corp.,* No. 8:17-cv-00548-AG-JPR (C.D. Cal.). Standing was never briefed in those cases, and Core was never deposed. Core Optical settled those cases without resolving the standing issue on the merits.

███████████████████████████████████████████████
███████████████████████████████████████████████

## III. LEGAL STANDARD

### A. Summary Judgment

Courts "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the moving party can show a lack of disputed material facts, the non-moving party must then "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–587 (1986). While courts construe facts in a light most favorable to the non-moving party and draw reasonable inferences in their favor, *see*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), they should grant summary judgment when a claim or defense is factually unsupported, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986), or when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," *Matsushita*, 475 U.S. at 587.

### B.  Patent Ownership and Assignment

Standing "is a threshold jurisdictional issue[.]" *Dominion Assets LLC v. Masimo Corp.*, No. 12-cv-02773-BLF, 2014 WL 2937058, at \*4 (N.D. Cal. June 27, 2014). Plaintiffs "must necessarily have standing" to sue for patent infringement. *Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574, 1578–79 (Fed. Cir. 1991). That is, they "must have held the *legal title* to the patent *during the time of the [alleged] infringement*." *Arachnid*, 939 F.2d at 1579 (emphasis in original). If parties "lack[] title to the patent," they have "no standing to bring an infringement action." *Filmtec Corp. v. Allied-Signal, Inc.*, 939 F.2d 1568, 1571 (Fed. Cir. 1991); *Lans v. Dig. Equip. Corp.*, 252 F.3d 1320, 1328 (Fed. Cir. 2001) (same).

While "initial ownership of a patent vests in the inventor[,]" those "inventors can assign all or part of their interest in a patent." *Regents Of Univ. Of N.M. v. Knight*, 321 F.3d 1111, 1118–19 (Fed. Cir. 2003); *Dominion Assets*, 2014 WL 2937058, at \*4 (plaintiffs lack standing to sue if they "assigned that title to another"). When an assignment agreement is involved, "state law governs the interpretation of contracts generally" but "the question of whether a patent assignment clause creates an automatic assignment or merely an obligation to assign is intimately bound up with the question of standing in patent cases" and is thus a "matter of federal law." *DDB Techs., L.L.C. v. MLB Advanced Media, L.P.*, 517 F.3d 1284, 1290 (Fed. Cir. 2008).

### IV.  ARGUMENT

Core Optical lacks standing to sue:  it does not own—nor has it ever owned—the sole patent-in-suit. Northrop Grumman, the successor to TRW and Core's former employer, owns the '211 patent because Core undisputedly conceived and reduced to practice the claimed invention on TRW's time, on TRW's dollar, and in furtherance of

his work for TRW, and that work was undoubtedly related to TRW's business. Under the Agreement, Core automatically assigned to TRW all inventions created during his employment *unless* the invention: (1) was developed entirely on his own time; (2) without use of TRW's equipment or supplies; *and* did not (3a) relate to TRW's business or (3b) result from *any* work that Core performed for TRW. Core cannot satisfy any of these conditions—thus rendering Northrop Grumman the sole owner of the '211 patent.

Starting in the early 1990s, Core pursued research on cross polarization interference cancellation as an engineer at TRW. In 1993, after several years of work on this topic, Core pursued doctorate research at U.C. Irvine through TRW's Fellowship Program—a program that allowed him to earn a graduate degree on TRW's dollar while also receiving a salary from TRW. To qualify for the fellowship, Core had to pursue doctoral work related to his work at TRW. And he did exactly that—he pursued doctoral research on the very same topic that he contributed towards at TRW: cross polarization interference cancellation. And in 1998 and 1999, while still a TRW employee and finishing his degree, Core filed the results of his TRW-funded doctoral research as the provisional and non-provisional applications resulting in the '211 patent. But Core never disclosed either of these patent applications to TRW even though the applications overlapped with both his prior engineering work at TRW and his TRW-funded research.

These facts bar Core Optical from claiming any potential ownership interest and doom this patent infringement lawsuit. To start, Core Optical does not dispute that Core developed the claimed invention of the '211 patent through TRW's financed fellowship (*i.e.*, his doctoral research). And because TRW paid for that research and opportunity— while simultaneously paying Core a salary and stipend to supplement his income—Core undisputedly conceived of and reduced to practice the invention on TRW's time and with TRW's supplies (*i.e.*, money). The record also confirms that Core's doctorate research on cross polarization interference cancellation was a continuation of his prior engineering work while a full-time TRW engineer. In fact, several of Core's colleagues have confirmed this very point. And just as important, TRW's fellowship aimed to bring

participants back to TRW with their increased engineering skills so that they could drive innovation at the company. And for Core, those engineering skills were, of course, on cross polarization interference cancellation.

The Court should thus find that Core Optical lacks standing to sue and grant summary judgment for Defendants on all counts.

## A. Core Automatically Assigned the '211 Patent to Northrop Grumman (TRW's Successor).

Core automatically assigned his entire interest in the '211 patent to TRW (now Northrop Grumman); no further act was needed. The Agreement is clear: Core "shall and *do[es] hereby assign* to TRW [his] entire right, title, and interest" in all "Inventions." SUF No. 7 (Invention Agreement, COREOPT0007678, ¶ 2) (emphasis added). If a "contract expressly grants rights in future inventions," … 'no further act [is] required once an invention [comes] into being.'" *DDB Techs.,* 517 F.3d at 1290 (quoting *Filmtec*, 939 F.2d at 1573). Title instead transfers "'by operation of law.'" *Id*.

The Agreement mirrors the language of the agreement in *DDB Technologies* and expressly grants rights in future inventions. The agreement in *DDB Technologies* stated that the inventor "agree[d] to and d[id] hereby grant and assign" all rights in future inventions to this employer through his employment contract. *Id*. Core's Agreement contains nearly identical language; the Agreement states that Core "shall and do[es] hereby assign" his entire interest in all inventions. SUF No. 7 (Invention Agreement, COREOPT0007678, ¶ 2). The Agreement thus contains "an express assignment of rights" in the invention of the '211 patent that were "automatically assigned" to TRW. *DDB Techs.*, 517 F.3d at 1290. The Federal Circuit reached the same conclusion with another nearly identical contract in *FilmTec*. 939 F.2d at 1570–72 (holding that language requiring the contracting party "agrees to grant and does hereby grant" all rights in future inventions automatically assigned future inventions without further action by either party); *see also Preston v. Marathon Oil Co.*, 684 F.3d 1276, 1288 (Fed. Cir. 2012) (finding employer owned patent rights because employee-inventor's

employment contract had "an express assignment of rights in future inventions that automatically assigned rights . . . without the need for any additional act").

The language of the Agreement is unambiguous—Core "expressly granted to [TRW] his rights … in any invention he developed while an employee of [TRW]." *Imatec v. Apple Comput., Inc.*, 15 F. App'x 887, 893 (Fed. Cir. 2001). Northrop Grumman, as the successor to TRW, is the sole owner of the '211 patent unless Core can establish that either of two exceptions applies.

## B. Neither Exception to Automatic Assignment Applies.

The Agreement provides two exceptions to automatic assignment of inventions created by its employees. The first is any reserved inventions that Core made before his employment. The second is for any "Non-TRW Inventions." Because neither applies here, Northrop Grumman—not Core Optical—owns the '211 patent and this case should be dismissed for lack of standing.

### 1. Reserved Inventions.

The Agreement does not cover an invention Core made before starting his employment at TRW, as long as it was disclosed in writing. SUF No. 10 (Invention Agreement, COREOPT0007678, ¶ 8). But this has no applicability to the '211 patent, which was not invented before he joined TRW and was never disclosed to TRW in any event. SUF Nos. 11–12 (Invention Agreement, COREOPT0007678, ¶ 8, at 2). Core did reserve another invention on a portable stereo FM transmitter that is not in dispute here. *Id*. But Core's reservation of one invention confirms that he understood his inventions were subject to automatic assignment, as he specifically reserved a prior invention to avoid assigning it to TRW.

### 2. Non-TRW Inventions.

The remaining exception is for a "Non-TRW Invention." SUF No. 13 (Invention Agreement, COREOPT0007678, ¶ 9). That provision holds that Core could retain an invention only by showing that: (1) "no equipment, supplies, facility, or trade secret information of TRW was used" to create the invention; ***and*** (2) the invention was

"developed entirely on [Core's] own time"; **and** (3a) the invention was unrelated to TRW's business or its "actual or demonstrably anticipated research and development" or (3b) the invention "d[id] not result from any work performed by [Core] for TRW."[4]

Here, Core Optical fails across the board; it cannot prove any requirement true. This Court—like many others that have considered similar scenarios—should thus find that Core Optical has no valid ownership interest in the '211 patent. In *Imatec*, the Federal Circuit affirmed a summary judgment dismissal of infringement claims against Apple because the plaintiff-inventor had assigned the disputed invention to his past (non-party) employer under a similar invention agreement. 15 Fed. App'x at 895. The court in *Cadence Design Systems, Inc. v. Bhandari* too found that because the named inventor had assigned the patent-in-suit to his former (again, non-party) employer, his company (as claimant) lacked standing to sue for infringement. No. 07-cv-00823-MHP, 2007 WL 3343085, at *1, *5–6, *8 (N.D. Cal. Nov. 8, 2007); *see also Lans*, 252 F.3d at 1324–25 (affirming dismissal of infringement suit for lack of standing because plaintiff-inventor assigned patent to non-party and thus "did not own the [patent-in-suit]"); *Jim Arnold Corp. v. Hydrotech Sys., Inc.*, 109 F.3d 1567, 1571–72 (Fed. Cir. 1997) (finding that plaintiff who assigned away patent rights lacked standing because he had no ownership interest in the patents).

This Court should follow these cases and dismiss this action with prejudice.

### a.    Core developed the invention on TRW's time.

The first question is whether Core developed the invention "entirely on his own time." SUF No. 13 (Invention Agreement, COREOPT0007678, ¶ 9). The clear answer is no. Core was a salaried TRW employee for 10 years—from 1990 through 2000. For

---

[4] While Core Optical's interrogatory responses suggest that the TRW Invention Agreement is somehow unconscionable, *see* Ex. Padmanabhan Decl. Ex. 11 (Core Optical Supplemental Response to Interrogatory No. 7) at 30–31, that is clearly false. California Labor Code Section 2870 defines the limits on invention assignment clauses between employers and employees, and the Agreement closely mirrors that language. *See* Cal. Labor Code § 2870(a).

about six of those years, Core also pursued his Ph.D. at U.C. Irvine at TRW's expense through TRW's fully-funded Fellowship Program. SUF Nos. 30–31 (Core Tr. at 69:17–70:6, 75:7–17, 96:23–97:4). TRW paid not only the tuition and costs of Core's doctoral studies, but also paid him a salary and stipend to support his research. *Id*.; *see also* SUF Nos. 25, 33–34 (Core Tr. at 70:25–71:9, 75:10–17; McGuire Decl. ¶ 7). Core admits that "[c]onception and reduction to practice of the asserted claims occurred in connection with [his] research for, development of, and preparation of his Ph.D. thesis"—all paid by TRW. SUF Nos. 31–34, 62 (Core Tr. at 69:17–70:6, 70:25–71:9, 74:21–75:2, 75:7–17, 96:23–97:4; Core Optical Response to Interrogatory No. 2 at 11; McGuire Decl. ¶ 7). He thus did so on TRW's time—making it TRW's invention.

*Cubic Corp.* is instructive. *Cubic Corp. v. Marty* (1986) 185 Cal.App.3d 438. There, an inventor employee, like Core here, challenged whether he, by virtue of a similar invention contract, had assigned his electronic warfare simulator invention to his past employer. *Id.* at 443–45. He had—with the court specifically noting that "there is substantial evidence to support the trial court's conclusion [that the] [employee] did not develop the invention entirely on his own time since he used Cubic personnel ***and funding*** to add circuitry which was necessary to make his invention work." *See id.* at 453 (emphasis added) (interpreting the California Labor Code provision with the same language as the TRW agreement, finding it was not intended to award inventions to an employee who "actively seeks and obtains company funding to refine his invention, [and] uses company time and funding to develop his invention while all the time secretly intending to take out a patent on the invention for himself." *Id.* That is exactly what happened here—TRW funded Core's doctoral research, and thus provided the time and resources used to develop his cross polarization invention. And TRW considered Core's Fellowship work (*i.e.*, his doctoral research) as work performed for TRW, and on TRW's time, given TRW's significant investment. *See* SUF Nos. 26–29 (McGuire Decl. ¶¶ 7, 9; Core Tr. at 69:17–70:6). TRW made that investment expecting to benefit from the Fellowship participant's advanced education. *Id*. Here, Core took the benefit

of the Fellowship Program for himself, and robbed TRW of the benefit of their investment.

Because Core did not develop the invention "entirely on his own time," he necessarily assigned his claimed technology to TRW—leaving Core Optical with no valid ownership interest.

> **b.    Core undisputedly used TRW's funding—*i.e.*, supplies— in developing the invention.**

The second requirement asks whether Core used any of TRW's "equipment [or] supplies" to create the cross polarization interference cancellation technology. SUF No. 13 (Invention Agreement, COREOPT0007678, ¶ 9). He did. His doctorate degree and related research that resulted in the '211 patent was fully-funded—tuition, costs, and stipend—through TRW's Fellowship Program. SUF Nos. 20, 31–34 (McGuire Decl. ¶¶ 7–8; Core Tr. at 69:17–70:6, 70:25–71:9, 74:21–75:2, 75:7–17, 96:23–97:4). *Cubic* is again instructive because the employee there developed necessary circuity "under a Cubic funded program." *Cubic*, 185 Cal.App.3d at 452–453; *see also id.* at 445 (employer "funded an internal project to study [employee's] invention"). These facts are also present here and they compel the same result: Core accepted and used TRW's Fellowship funding for research that led to the patented technology.

Moreover, Dr. Core's research and doctorate program fell within the scope of his TRW employment. *Dimming v. Workers' Comp. Appeals Bd.* offers helpful guidance. *Dimming v. Workmen's Comp. Appeals Bd.* (1972) 6 Cal.3d 860. There, one key inquiry was whether a contract administrator's participation in night classes fell within the scope of his employment. *Id.* at 865–66. It did—and for several reasons. To start, the employer there, like TRW here, "was encouraging … educational activities which were found to benefit the corporation." *Id.* at 866; *see also id.* at 862 (employer "had established a policy of encouraging its employees to attend college"). And it paid "the entire cost of tuition and books for courses directly related to the employee's job." *Id.* at 862. But this was not a one-sided transaction: the employer directly benefited because

educated employees could "perform more effectively in their present jobs and increase
their qualifications and knowledge for advancement." *Id.* The focus of the program was
thus on "the type of activity which most directly improves the employee's ability to
perform his assigned tasks more effectively." *Id.* at 866. TRW's fellowship had the
same goal: participants would pursue education to develop advanced engineering skills
and use those skills to push technology development at TRW. *See* SUF Nos. 20–21, 26–
29  (McGuire Decl. ¶¶ 7–9; Core Tr. at 72:5–23). TRW only funded such education if
TRW determined that it was directly related to the employee's job at TRW or a job that
the employee could reasonably expect to fill at TRW. SUF Nos. 20–21 (McGuire Decl.
¶¶ 7–8). As a result, the "benefit received by [TRW] in this case is directly related to
[Core's] job functions and thus may be said to fall within the course of his
employment." *Dimming*, 6 Cal.3d at 864. Indeed, Core's admission that he developed
his invention while pursuing doctoral research funded by TRW is an admission that he
relied on TRW's supplies to develop his invention. *See Cubic*, 185 Cal.App.3d at 453
(Court did "not think" that the California "Labor Code provisions were intended to
award an invention to an employee who . . . seeks and obtains company funding to
refine his invention" and "uses company time and funding to develop his invention
while all the time secretly intending to take out a patent on the invention for himself.")

Core thus necessarily used TRW's supplies and consequently assigned his
invention to TRW—stripping Core Optical of standing to sue.

### c.       The invention relates directly to TRW's business and its research and development.

Core's use of TRW's funding—and his development of his invention on TRW's
time—ends the inquiry. Each is independently dispositive. But even if Core Optical
could show a disputed material fact—which it cannot—Core still assigned the '211
patent to TRW because the claimed invention undoubtedly relates directly to TRW's
business and research. More importantly, the invention here relates directly to TRW
research and projects that Core himself was involved with at TRW.

Courts interpret the phrase "related to" broadly. *Cadence*, 2007 WL 3343085, at *5. And the issue here was the exact issue in *Cadence*: did an invention potentially subject to assignment "relate to" an employer's business? *Cadence*, 2007 WL 3343085, at *7. Here, the answer is clearly "yes": TRW was researching and working on cross polarization interference cancellation issues while paying for Core's doctoral research on the same. Core worked on a TRW cross polarization interference cancellation project where his design portion aimed to "compute[] the control signals for an adaptive equalizer and a crosspol canceller." SUF Nos. 43, 48–51 (Core Tr. at 20:21–21:2, 22:19–23:17; Yamashiro Decl. ¶¶ 6–11). And many of Core's colleagues recognized his work in this field. For example, Core's manager and other coworkers specifically thanked Core for his contributions given his "participat[ion] in the unit designs, system integration, and system tests" of a system implementing a "Cross Polarization Cancellor." SUF No. 41 (Kolze Article, CIS-COREOPTICAL-00011349, at 1357). Two more colleagues also documented Core's work on cross polarization interference in letters of recommendation supporting his application to pursue a doctorate at U.C. Irvine. His direct supervisor contemporaneously noted that "***Mark was directly responsible for implementing a cross polarization interference cancellation system***." SUF No. 46 (UCI0114, at 0115) (emphasis added). And another TRW engineer wrote that Core "used a clear analytical approach to the signal processing algorithm design and implementation" for a "Cross-Polarization Canceller (CPC)" project. SUF No. 47 (UCI0112, at 0112). Core's doctoral research was therefore in furtherance of TRW's research and development efforts. SUF No. 44 (Core Tr. at 33:8–11, 83:4–84:5; UCI0112, at 112).

While receiving TRW funding to pursue his research at U.C. Irvine on cross polarization interference cancellation, Core worked on projects related to the same subject matter at TRW over the course of a decade. TRW estimated that the work of Core and his colleagues on cross polarization interference cancellation contributed over ███████████ to its business and awarded that team (including Core) one of the

21

company's highest honors (the annual TRW Chairman's Award) for that work. SUF Nos. 54, 56 (Yamashiro Decl. ¶ 10). And lest there be any doubt regarding TRW's interest in pursuing patent protection related to its cross polarization interference cancellation system, TRW applied for and received a patent stemming from that very work. SUF Nos. 52–53 (Yamashiro Decl. ¶ 9; U.S. Patent No. 5,692,014)

Core Optical may contend that Core's invention was unrelated because it initially receives an optical signal rather than a RF signal. But while the '211 patent may contemplate devices that initially receive an optical signal, those devices can then convert the signal to a RF signal *and perform cross polarization interference cancellation—the supposedly inventive feature—on that RF signal*. *See* SUF Nos. 84–86 ('211 patent, 8:29–31, 10:27–33 (disclosing an embodiment that converts the received optical signal to a RF signal prior to processing by the XPIC); Core Tr. at 256:1–5, 256:15–18). It is undisputed that TRW, including Core himself, performed substantial work on cross polarization interference cancellation on RF signals. Any distinction between optical signals and RF signals is also irrelevant because TRW was heavily involved in the optical communications business. SUF Nos. 88–89 (Oki Decl. ¶¶ 3–6). In fact, while Core pursued his doctoral research and filed the '211 patent, TRW was itself developing 10 Gigabit and 40 Gigabit optical receivers. SUF No. 89 (Oki Decl. ¶¶ 4–6). A key aspect of that work was tackling interference issues, which is the purported goal of the '211 patent. SUF Nos. 90–91 (Oki Decl. ¶ 6; '211 patent at 1:11–19, 2:36–3:7).

Like in *Cadence*, the patented technology was undisputedly "part of [TRW's] business." 2007 WL 3343085, at *6. And because the '211 patent relates to TRW's business, Core assigned to it to TRW thereby barring Core Optical from claiming any potential ownership interest.

### d.     The invention resulted from Core's work for TRW.

Core Optical cannot plausibly argue that the '211 patent did not result from "***any*** work" Core performed for TRW, and thus cannot prove this condition either. SUF No.

13 (Invention Agreement, COREOPT0007678, ¶ 9). Core's doctoral research—which he admits led to the '211 patent—was work performed under TRW's Fellowship Program, for which TRW paid tuition, costs, a salary, and a stipend to Core, and which required the work to be related to his work for TRW. *See* SUF Nos. 20–25, 31–34 (McGuire Decl. ¶¶ 7–9; Core Tr. at 69:17–70:6, 70:25–71:9, 73:22–75:17, 96:23–97:4).

An analysis of the facts is further telling. To start, Core had never worked on the issue of cross polarization interference cancellation until he joined TRW. SUF Nos. 45 (Core Tr. at 20:4–7). But at TRW, Core worked on this issue extensively. In fact, three TRW engineers (Yamashiro, Finkenbeiner, and Kolze) published an article that outlined TRW's development of a cross polarization interference cancellation system and recognized Core's contributions. Those contributions were so significant that they were featured heavily in Core's recommendation letters for his U.C. Irvine doctoral program: one colleague noted that Core "was ***directly responsible*** for implementing a cross polarization interference cancellation system," and another touted Core's "use[] of a clear analytical approach" for a "Cross-Polarization Canceller (CPC)" project. SUF Nos. 46–47 (UCI0114, at 0115; UCI0112, at 0112) (emphasis added).

These recommendations were not hyperbole. TRW's program lead, Keith Yamashiro, explains that Core implemented the algorithms that were the "brains" of TRW's cross polarization interference cancellation system, and that directly instructed the cross polarization interference canceller. SUF No. 49 (Yamashiro Decl. ¶ 7).

It is no coincidence then that the '211 patent features the very same algorithms that Core worked on to instruct the TRW cross polarization interference canceller— including the differential steepest descent algorithm. SUF Nos. 50, 83 (Yamashiro Decl. ¶ 7; '211 patent at 8:29–31). The '211 patent also features the mean square error algorithm that Core refined to measure how well cross polarization interference was being eliminated by the TRW canceller. SUF No. 41 (Yamashiro Decl. ¶ 7; NGC_0000025; '211 patent at 16:24–27, cl. 35). The algorithm appears explicitly in asserted claim 35. SUF No. 87 ('211 patent at 16:24–27, cl. 35). Similarly, claim 30 of

the '211 patent recites the same architecture as the TRW cross polarization interference canceller—(1) receiving a signal with two polarized signals, (2) each modulated with an independent information waveform, (3) separating the signal into the two orthogonally polarized signals to create a first output and second output, and (4) feeding the first output and second output to a cross polarization interference canceller. SUF Nos. 78–82 (Core Tr. at 125:15–18, 127:5–130:3, 83:11–24; '211 patent at cl. 30; COREOPT00010653, at 0661; Yamashiro Decl. ¶ 6; CIS-COREOPTICAL-00011349 at Fig. 1). Core's work at TRW was so critical to his invention, that when approaching investors to fund commercialization of the '211 patent, Core explained that "the XPIC concept **has been proven**" by his work at TRW. SUF No. 75 (COREOPT0017642, at 7644; Core Tr. at 198:9–16, 206:13–207:16). He even hired a former TRW colleague from the cross polarization interference cancellation team, Derek Kubo, to help implement the '211 patent. SUF Nos. 72–73 (Core Tr. at 217:18–218:4; COREOPT0010625, at 0628; Yamashiro Decl. ¶ 11).

The undisputed facts are overwhelming, and Core Optical cannot reasonably argue that the '211 patent "d[id] not result from *any work* performed by [Dr. Core] for TRW." *See General Elec. Co. v. Wilkins*, No. 1:10-cv-0067-OWW-JLT, 2011 WL 1740420, at *11 (E.D. Cal. May 5, 2011) (employer was likely to prove ownership of patent because former employee worked on technology underlying the patent during his employment).

## C.    Additional Evidence Confirms Northrop Owns the '211 Patent.

Undisputed facts surrounding Core's pursuit of the '211 patent only confirm that he obtained that patent through subterfuge, in an attempt to avoid his assignment to TRW. Core never disclosed to TRW that his doctoral research contained any patentable inventions, and never provided a copy of his provisional or non-provisional patent applications to TRW, despite a clear disclosure obligation under the Agreement. SUF Nos. 64–66 (Core Tr. at 48:21–50:19, 51:3–53:22, 57:2–14, 178:24–179:17; Invention Agreement, COREOPT0007678, ¶¶ 1, 9). Similarly, Core never obtained clearance

from anyone at TRW with the authority to establish that he could independently pursue his invention, or that TRW was not the owner of that invention. SUF No. 67 (Core Tr. at 39:25–41:3, 52:15–53:22, 57:2–5, 177:15–179:22).  At most, Core testified that he gave a copy of his Ph.D. dissertation to his manager, Pascal Finkenbeiner. SUF No. 68 (Core Tr. at 48:10–53:2). Similarly, Core supposedly asked a TRW employee, Mark Garroway, whether his Ph.D. research was his to keep or TRW's. SUF No. 69 (Core Tr. at 52:2–14; 179:18–22). But Core admits that he knew Garroway was not authorized to make any such assessment. SUF No. 70 (Core Tr. at 52:2–14, 179:18–22). Core's testimony about his conversation with Garroway reveals a deeper undisputed truth— that Core himself was concerned at the time that the patent belonged to TRW. *See* SUF Nos. 68–70 (Core Tr. at 48:10–53:2, 179:18–22). Despite having recognized the problem, Core never disclosed his provisional or non-provisional patent application to TRW (including Mr. Garroway). SUF Nos. 64–65 (Core Tr. at 48:21–50:19, 51:3–53:22, 57:2–14, 178:24–179:17). Instead, he left TRW as soon as he completed his one-year post-fellowship commitment and then attempted to commercialize the '211 patent.

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
██████████████████████████████████████████████

## V.    CONCLUSION

The facts show that the sole patent-in-suit belongs to Northrop Grumman, not Core Optical, and that Core Optical has no standing to bring the instant cases. The Court should thus grant summary judgment for Defendants and dismiss all of Core Optical's claims with prejudice.

1   Dated:  September 7, 2021          /s/ *David P. Enzminger*
2                                      David P. Enzminger (SBN 137065)
                                       denzminger@winston.com
3                                      **Winston & Strawn LLP**
                                       333 S. Grand Ave.
4                                      Los Angeles, CA 90071
                                       Telephone: 213-615-1700
5                                      Facsimile: 213-615-1750

6                                      Krishnan Padmanabhan (SB: 254220)
                                       kpadmanabhan@winston.com
7                                      **Winston & Strawn LLP**
                                       200 Park Avenue
8                                      New York, NY 10166
                                       Telephone: (212) 294-6700
9                                      Facsimile: (212) 294-4700

10
                                       Robert N. Kang (SBN 274389)
11                                     rkang@winston.com
                                       **Winston & Strawn LLP**
12                                     101 California Street, Suite 3500
                                       San Francisco, CA 94111
13                                     Telephone:  (415) 591-1000
                                       Facsimile:   (415) 591-1400
14
                                       Michael French (Pro Hac Vice)
15                                     mfrench@winston.com
                                       **Winston & Strawn LLP**
16                                     800 Capitol Street, Suite 2400
                                       Houston, TX 77002
17                                     Telephone: (713) 651-2600
                                       Facsimile: (713) 651-2700
18

19                                     ***Attorneys for Cisco Systems, Inc. and ADVA***
                                       ***Defendants***
20

21                                     /s/ *Thomas W. Davison*
                                       John D. Haynes (admitted *pro hac vice*)
22                                     john.haynes@alston.com
                                       ALSTON & BIRD LLP
23                                     1201 West Peachtree Street
                                       Atlanta, GA 30309
24                                     Telephone: (404) 881-7000
                                       Facsimile: (404) 881-7777
25
                                       Thomas W. Davison (admitted *pro hac vice*)
26                                     tom.davison@alston.com
                                       ALSTON & BIRD LLP
27                                     950 F Street, NW
                                       Washington, DC 20004
28                                     Telephone: (202) 239-3300

Facsimile: (202) 239-3333

H. James Abe (State Bar No. 265534)
james.abe@alston.com
ALSTON & BIRD LLP
333 South Hope Street, 16th Floor
Los Angeles, CA  90071
Telephone: (213) 576-1000
Facsimile: (213) 576-1100

***Attorneys for Defendants Nokia Corp. and Nokia of America Corp.***

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
CASE NOS. 8:20-CV-1468-JAK-RAO; 8:19-CV-2190-JAK-RAO; 8:19-CV-2190-JAK-RAO