UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV19-2190 JAK (RAO)<br>SA CV20-1463 JAK (RAO)<br>SA CV20-1468 JAK (RAO) | Date | August 4, 2022 |
|---|---|---|---|
| Title | Core Optical Technologies, LLC v. Nokia Corporation et al<br>Core Optical Technologies, LLC v. ADVA Optical Networking SE et al<br>Core Optical Technologies, LLC v. Cisco Systems, Inc. et al | | |

Present: The Honorable    JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE

| T. Jackson-Terrell | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| Not Reported | Not Reported |

Proceedings:         ORDER REGARDING DEFENDANTS' SUMMARY JUDGMENT MOTION

I.    **Introduction**

On November 12, 2019, Core Optical Technologies, LLC ("Plaintiff" or "Core Optical") brought a patent infringement action against Nokia Corporation and Nokia of America Corporation (collectively, "Nokia"). *See Core Optical Techs., LLC v. Nokia Corp. et al*, No. SA CV19-2190 JAK (RAOx). On August 6, 2020, Plaintiff brought a patent infringement action against ADVA Optical Networking SE and ADVA Optical Networking North America, Inc. (collectively, "ADVA"). *See Core Optical Techs., LLC v. ADVA Optical Networking SE et al*, No. SA CV20-1463 JAK (RAOx). On August 7, 2020, Plaintiff brought a patent infringement action against Cisco Systems, Inc. ("Cisco"). *See Core Optical Techs., LLC v. Cisco Systems, Inc. et al*, No. SA CV20-1468 JAK (RAOx). In these matters, Plaintiff alleges that Nokia, ADVA, and Cisco (collectively, "Defendants") infringed Claims 30, 32, 33, 35, and 37 ("the Asserted Claims") of U.S. Patent No. 6,782,211 ("the '211 Patent") until the '211 Patent expired on November 4, 2019. *See generally* Dkt. 36 ("SAC").[1]

Defendants have moved for summary judgment on the grounds that Plaintiff does not own the '211 Patent and lacks standing to sue Defendants for infringement of the '211 Patent. ("Motion" (Dkt. 65); Dkt. 70 (sealed version)). Plaintiff filed an opposition to the Motion. ("Opposition" (Dkt. 83)); Dkt. 87 (sealed version). Defendants filed a reply. ("Reply" (Dkt. 88)); Dkt. 97 (sealed version). A hearing on the Motion was conducted on December 6, 2021 and it was taken under submission. Dkt. 105.

For the reasons stated in this Order, the Motion is **GRANTED**.

---

[1] Unless otherwise specified, all citations are to *Core Optical Techs., LLC v. Cisco Systems, Inc. et al*, No. SA CV20-1468 JAK (RAOx).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV19-2190 JAK (RAO)<br>SA CV20-1463 JAK (RAO)<br>SA CV20-1468 JAK (RAO) | Date | August 4, 2022 |
|---|---|---|---|
| Title | Core Optical Technologies, LLC v. Nokia Corporation et al<br>Core Optical Technologies, LLC v. ADVA Optical Networking SE et al<br>Core Optical Technologies, LLC v. Cisco Systems, Inc. et al | | |

II.    **Background**

    A.    The '211 Patent

The '211 Patent, titled "Cross Polarization Interface Canceler," issued on August 24, 2004, to Dr. Mark T. Core. Dr. Core assigned the '211 Patent to Plaintiff, and the assignment was recorded with the USPTO. *See* Dkt. 36 ¶ 17; Dkt. 83-12, Exs. 3, 4. The '211 Patent relates to fiber optics and discloses "a cross-polarization interference canceler (XPIC) and its corresponding method of operation that optimizes bandwidth efficiency over an optical fiber transmission medium and mitigates dispersion effects or any loss of optical field orthogonality incurred during propagation through the optical fiber." '211 Patent at 1:13–19.

The "Background" section of the specification states that "optical communication networks" are used for "fast data transmission" and include a transmitter and a receiver "coupled together by optical fiber supporting one or more fiber optic transmission channels." *Id*. at 1:21–26. The transmitter "converts an electrical signal to a single optical signal" to send through the optic channels, and "[t]he receiver converts the optical signal back to an electrical signal, which may be routed through electrical wire or processed by a computer for example." *Id*. at 1:27–31. According to the specification, a conventional receiver in a fiberoptic system "includes a pair of polarization beam splitters," which separate the incoming optical signal into two orthogonal components: a vertical component and a horizontal component. *Id*. at 1:38–2:22. After processing and converting the two components into two electrical signals, the system combines the two signals to produce a single electrical signal. *Id*. at 1:60–2:25.

In a dual-polarization fiberoptic system, there are two receivers, and each receives one of two incoming optic signals with orthogonal polarization states. *Id*. at 2:23–40. However, some of the orthogonality of the two optical signals is lost during transmission when the system receives the signals, resulting in a "signal crosstalk penalty" or "cross polarization interference (XPI)." *Id*. at 2:36–48. This XPI has "adverse effects on the quality and reliability of the optical signaling." *Id*. at 2:48–50. Further, the optical signals may experience "dispersion" problems, which occurs "when a light pulse, normally associated with a particular period of time, begins to occupy portions of the time period associated with adjacent light pulses." *Id*. at 2:51–56.

According to the specification, the '211 Patent solves those XPI and dispersion issues by including a "cross polarization interference canceler (XPIC)" in the receiver. *Id*. at 3:10–13; *see also id*. at 4:5–9 (explaining that the XPIC also corrects for dispersion problems). Specifically, "the XPIC optimizes bandwidth efficiency of an optical link by enabling the reconstruction of two optical signals transmitted with generally orthogonal polarization states and routed over a single fiber optic transmission medium in the same frequency band." *Id*. at 3:13–18. The specification discloses that "the XPIC must be implemented optically for direct detection fiber optic systems," but "can be implemented either optically or electrically in coherent systems." *See id*. at 4:26–34; *see also id*. at 4:34–39 (explaining what a "coherent" optical system is). In the '211 Patent, each XPIC takes the two orthogonal signal components

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV19-2190 JAK (RAO)<br>SA CV20-1463 JAK (RAO)<br>SA CV20-1468 JAK (RAO) | Date | August 4, 2022 |
|---|---|---|---|
| Title | Core Optical Technologies, LLC v. Nokia Corporation et al<br>Core Optical Technologies, LLC v. ADVA Optical Networking SE et al<br>Core Optical Technologies, LLC v. Cisco Systems, Inc. et al | | |

created by the beam splitters and performs "complex filtering or weighing and subsequent recombining of these inputs to mitigate [XPI]." *Id.* at 6:56–63, 9:10–17; *see also id.* at 22:30–33 (describing similar process for baseband XPIC), 23:29–31 ("Baseband XPIC **950** is, in fact, functionally equivalent to IF XPIC **670** of FIG. **6**.").

The specification discloses that at least in one embodiment, "XPIC **320** is comprised of four independent optical filters **400**, **410**, **420**, and **430** as shown in FIG. **4A**." *Id.* at 8:16–17. According to the specification, "[o]ne example of a well-known adaption procedure for these filters is the method of differential steepest descent," also referred to as a "DSD" algorithm. *Id.* at 8:26–31; *see also* Dkt. 83-3 ("Core Decl.") ¶ 65; Dkt. 87-3 (sealed version); Dkt. 83-6 ("Kahn Decl.") ¶¶ 20, 27; Dkt. 87-7 (sealed version); *see also id.* ¶¶ 68–72 (describing the DSD algorithm in further detail). The specification further discloses that in the embodiments with filters, the only difference between the optical XPIC and electrical or "electrical intermediate frequency (IF)" XPIC is that the four independent filters "are now electrical and operate at microwave frequencies rather than optical frequencies." '211 Patent at 10:30–33. Further, for the IF XPIC, the specification describes a "minimum mean square error (MMSE) XPIC solution" as "a compromise between interference cancellation and [signal-to-noise ratio (SNR)] reduction" issues that result when the received optical signals are non-orthogonal. *Id.* at 16:21–27.

Figure 6, which is reproduced below, depicts "an exemplary implementation of a coherent fiber optic link having a receiving device utilizing an IF XPIC":



*Figure 6*

*Id.* at 3:43–44, Fig. 6. As seen in Figure 6, the receiving device **600** includes two polarization beam splitters **610** and **615,** a local oscillator ("LO"), labelled "LOCAL OSC. **630**," an optical receiver **605**, which includes two double-balanced optical receivers ("DBORs"), labelled "DBOR1 **635**" and "DBOR2 **650**," an

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV19-2190 JAK (RAO)<br>SA CV20-1463 JAK (RAO)<br>SA CV20-1468 JAK (RAO) | Date | August 4, 2022 |
|---|---|---|---|
| Title | Core Optical Technologies, LLC v. Nokia Corporation et al<br>Core Optical Technologies, LLC v. ADVA Optical Networking SE et al<br>Core Optical Technologies, LLC v. Cisco Systems, Inc. et al | | |

XPIC **670**, and two demodulators, labelled "DEMOD **675**" and "DEMOD **680**." *Id*. at 1:56–67 (describing conventional DBORs and LO); 10:27–36, 10:61–64, 11:28–37.

The Asserted Claims recite:

30.    A method comprising:
receiving an optical signal over a single fiber optic transmission medium, the optic signal being one or more polarized field components independently modulated with independent information bearing wave-forms; and
processing the optical signal by (i) separating the optical field of the optical signal into orthogonally polarized field components, (ii) routing each of the orthogonally polarized field components to a coherent optical receiver to produce a first output and a second output, and (iii) transmitting the first and second outputs to a cross polarization interference canceler (XPIC).

32.    The method of claim 30, wherein the first and second outputs are demodulated prior to transmission to the XPIC.

33.    A method comprising:
receiving an optical signal over a single fiber optic transmission medium, the optical signal being at least two polarized field components independently modulated with independent information bearing wave-forms; and
mitigating cross polarization interference associated with the at least two modulated polarized field components to reconstruct the information bearing waveforms using a plurality of matrix coefficients being complex values to apply both amplitude scaling and phase shifting to the at least two modulated polarized field components.

35.    A method comprising:
receiving at least two optical signals with independent information bearing waveforms over a single fiber optic transmission medium, the at least two optical signals having been transmitted with generally orthogonal polarization states; and
mitigating cross polarization interference associated with the at least two optical signals to reconstruct the information bearing waveforms, mitigation of the cross polarization interference is accomplished through a matrix multiplication using a cross polarization interference canceler that produces the recovered signals with the minimum mean square error (MMSE) relative to the desired transmitted signals.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV19-2190 JAK (RAO)<br>SA CV20-1463 JAK (RAO)<br>SA CV20-1468 JAK (RAO) | Date | August 4, 2022 |
|---|---|---|---|
| Title | Core Optical Technologies, LLC v. Nokia Corporation et al<br>Core Optical Technologies, LLC v. ADVA Optical Networking SE et al<br>Core Optical Technologies, LLC v. Cisco Systems, Inc. et al | | |

37.    A method comprising:

receiving at least two optical signals with independent information bearing waveforms over a single fiber optic transmission medium, the at least two optical signals having been transmitted with generally orthogonal polarization states; and

eliminating cross polarization interference associated with the at least two optical signals to reconstruct the information bearing waveforms, the elimination of the cross polarization interference is accomplished through matrix multiplication using a diagonalizer cross polarization interference cancellation network being a general inverse of a transmission matrix associated with the transmitter and the single fiber optic transmission medium.

'211 Patent at Claims 30, 32, 33, 35, and 37.

B.    Dr. Core and TRW, Inc.'s RF Satellite Receiver Projects

The events leading to this dispute involve Dr. Core, sole member and manager of Plaintiff, and his prior employment at TRW Inc ("TRW"). *See* Dkt. 36 ¶ 16; Dkt. 83-3 ¶ 3. TRW Inc., an Ohio Corporation, was an aerospace, defense, and commercial electronics company located in Southern California. *See* Dkt. 65-1 ("SUF") ¶ 1; Dkt. 70-1 (sealed version). Dr. Core began working at TRW in August 1990 as a "digital design and high-speed logic design engineer." *See* Dkt. 65-1 ¶ 3; Dkt. 83-3 ¶ 8; Dkt. 83-1 ("Resp. to SUF") ¶ 3; Dkt. 87-1 (sealed version). Prior to joining TRW, Dr. Core had not worked on cross polarization cancellation technology. Dkt. 65-1 ¶ 45. As a condition of his employment, Dr. Core signed an invention agreement ("the Agreement") in August 1990. *See* Dkt. 65-1 ¶¶ 5, 6 (citing Dkt. 65-5 (the Agreement)). The Agreement states Dr. Core "shall and do[es] hereby assign to TRW [his] entire right, title, and interest" in all inventions to TRW, "which relate to the business or activities of TRW," with the following exception listed in paragraph 9 of the Agreement, titled "Non-TRW Inventions":

> 9.  Non-TRW Inventions.  I understand that this Agreement does not require me to assign to TRW my rights to an INVENTION for which no equipment, supplies, facility, or trade secret information of TRW was used and which was developed entirely on my own time, and (a) which does not relate (1) to the business of TRW or (2) to TRW's actual or demonstrably anticipated research or development, or (b) which does not result from any work performed by me for TRW.  Nevertheless, I shall disclose to TRW those INVENTIONS referred to in this paragraph 9 to enable TRW to determine if it has an interest therein.

Dkt. 65-5 at COREOPT0007678.[2]

---

[2] The Agreement defines "INVENTIONS" as "any invention, innovation, discovery, computer program, process, trade secret, technique, or the like." Dkt. 65-5 at COREOPT0007678. The Agreement also states that Dr. Core was

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV19-2190 JAK (RAO)<br>SA CV20-1463 JAK (RAO)<br>SA CV20-1468 JAK (RAO) | Date | August 4, 2022 |
|---|---|---|---|
| Title | Core Optical Technologies, LLC v. Nokia Corporation et al<br>Core Optical Technologies, LLC v. ADVA Optical Networking SE et al<br>Core Optical Technologies, LLC v. Cisco Systems, Inc. et al | | |

Between 1990 and 1992, TRW originally developed its "CPC" or "cross-polarization canceler." *Compare* Dkt. 83-1 ("In 1990-1991, there was the original development of TRW's CPC") (citing 83-3 ¶ 56; Dkt. 83-5, Ex. 9 at CIS-COREOPTICAL-11352 ("CPC unit developed in 1991"); Dkt. 87-6, Ex. 9 (sealed version)), *with* Dkt. 83-2 ("SAF") ¶ 159 ("TRW originally developed its RF CPC in 1991–1992"); *see also* Dkt. 65-25 ("Yamashiro Decl.") ¶ 6 n.1 (explaining that a CPC is also referred to as a CPIC or XPIC). Between 1990 and 1991, Dr. Core began working on a "Digital Signal Processor" or "DSP" that was programmed to provide digital control words for a CPC in a satellite receive system. Dkt. 83-3 ¶ 56. Specifically, Dr. Core's task was to implement a DSP that would control the "tap weights" within the CPC. *Id.*

While Dr. Core was employed at TRW, TRW had three "RF satellite receiver projects" "related to CPCs, or cross-pol [(short for cross-polarization)] cancelers." *See* Dkt. 65-1 ¶¶ 38; Dkt. 83 at 8–11; Dkt. 83-1 ¶ 38; Dkt. 83-3 ¶¶ 56–84. First, TRW had a project called "Advanced Data Links," or "ADL," for "a classified government customer," which began in 1992. Dkt. 83-1 ¶¶ 38, 40; Dkt 83-2 ¶ 155. This project was described in an August 11, 1992 presentation by TRW, titled "High Data Rate Communications" ("the 1992 Presentation"), and "re-used the CPC that was originally developed in 1991." *Id.* (citing Dkt. 83-3 ¶¶ 61–63; 83-4, Ex. 14; Dkt. 87-5, Ex. 14 (sealed version); Dkt. 83-5, Ex. 9 at CIS-COREOPTICAL-11352; Dkt. 83-7, Ex. 6; Dkt. 87-9, Ex. 6 (sealed version); Dkt. 83-12, Ex. 1 at 61:25–62:11, 99:4–12, 103:15–21; Dkt. 87-15, Ex. 1 (sealed version)). The ADL project involved developing a link between a space-based radio frequency ("RF") transmitting system and a ground-based RF receiving system." Dkt. 83-3 ¶¶ 59, 60; Dkt. 83-6 ¶ 18; *see also generally* Dkt. 65-27; Dkt. 70-9 (sealed version). Specifically, "the ADL system was intended to be a 'dual-polarization' radio frequency system, i.e., one in which separate signals were sent across free space in orthogonal polarization states." Dkt. 83-6 ¶ 21. For the ADL project, these two states are referred to as the "Right Hand Circular Polarization" (""RHCP") and "Left Hand Circular Polarization" (LHCP"). *Id.*; *see also* Dkt. 83-3 ¶ 60.

Reproduced below is a diagram of the RF receiving system from the 1992 Presentation:



Dkt. 65-27 at 10.

---

not required to assign all "Reserved Inventions." *Id.* Plaintiff does not dispute that the '211 Patent was not a "Reserved Invention."

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV19-2190 JAK (RAO)<br>SA CV20-1463 JAK (RAO)<br>SA CV20-1468 JAK (RAO) | Date | August 4, 2022 |
|---|---|---|---|
| Title | Core Optical Technologies, LLC v. Nokia Corporation et al<br>Core Optical Technologies, LLC v. ADVA Optical Networking SE et al<br>Core Optical Technologies, LLC v. Cisco Systems, Inc. et al | | |

The receiving system receives the signals using antennas, then sends the signals to an "Orthomode Transducer" ("OMT"), which separates the received signals into the RHCP and LHCP radio signals. Dkt. 83-6 ¶ 24. After being amplified by the "Low Noise Amplifiers" (LNA), the signals travel to the CPC and "Adaptive Equalizers" ("AE"), which correct certain distortions, including XPI, in the signals. *Id*. For the project, Dr. Core designed a processor, i.e., the DSP, and programmed a DSD algorithm into the DSP "to generate tap weights [for the CPC] that would minimize the mean squared error of the data." Dkt. 83-3 ¶ 65; Dkt. 83-6 ¶ 20, 27. The DSP receives feedback from the "Direct Demodulator/Bit Synchronizers" ("DDBS" or "DBS") and uses that feedback to compute the tap weights used by the CPC to correct cross-polarization distortion of the signals. Dkt. 83-6 ¶¶ 24, 29, 31. To implement the DSD algorithm, Dr. Core relied on a 1976 published article titled, "A Comparison of Adaptive Algorithms Based on the Methods of Steepest Descent and Random Search," by Bernard Widrow and John Widrow ("the Widrow Paper"). Dkt. 83-3 ¶ 68; Dkt. 83-5, Ex. 18 (the Widrow Paper); Dkt. 87-6, Ex. 18 (sealed version).

Second, in 1993, "TRW did internal research and development on a ground-based satellite receiver in a 'test bed' within a TRW laboratory." Dkt. 83-2 ¶ 156.[3]  This project involved a modified version of TRW's 1991 CPC. Dkt. 83-1 ¶ 38 (citing Dkt. 83-5, Ex.9 at CIS-COREOPTICAL-11352). An article titled "Advanced Signal Processing System for Demodulation, Equalization and Crosspol Optimization of GBPS Data Streams," describing the "test bed" project, was published in 1993. Dkt. 83-1 ¶¶ 38, 39; Dkt. 83-2 ¶ 156; Dkt. 83-7, Ex. 9 ("the 1993 Article"). In the acknowledgement section, the 1993 Article states, "The authors would like to recognize the contributions of Derek Kubo, Ruben Kagawa, Vincent Nguyen, Mark Core and Tim Clifford who participated in the unit designs, system integration, and system tests." Dkt. 83-7, Ex. 9 at CIS-COREOPTICAL-11357. For the project, Dr. Core programmed the project's processor with a DSD algorithm to control the AEs, as detailed in a July 23, 1993 memorandum Dr. Core sent to his supervisor, titled "Adaptive Equalizer Parameter Definition" ("the 1993 Memo"). Dkt. 83-3 ¶¶ 76 (explaining that "the processor also used the DSD algorithm to generate control words for the AEs, as it did for the CPC"), 77; Dkt. 65-28 (the 1993 Memo); Dkt. 70-10 (sealed version). In 1998, TRW awarded Dr. Core and five other TRW employees the TRW Chairman's Award for their work on the project. Dkt. 65-1 ¶ 54; Dkt. 83-1 ¶ 54; Dkt. 65-31 (presentation titled "1998 Chairman Award: Adaptive Wideband Receiver Employing Digital Signal Processing Techniques," listing Dr. Core on cover slide and as a "Key Team Player" for his role in "DSP Algorithm Development"); Dkt. 70-12 (sealed version).

Finally, in 1999, "TRW had a project to develop a revised [CPC] for a satellite receive system," but Dr. Core was not involved with it. Dkt. 83-2 ¶ 157.

---

[3]  The evidence can be interpreted as showing that this second project was an extension of the ADL project rather than a separate project. *See, e.g.*, Dkt. 83-6 ¶ 33 (explaining that Dr. Core work on the AEs described in the 1993 Memo and 1993 Article was for the ADL project rather than a separate project in 1993). Nevertheless, for purposes of this Order, Plaintiff's distinction between the two is accepted.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV19-2190 JAK (RAO)<br>SA CV20-1463 JAK (RAO)<br>SA CV20-1468 JAK (RAO) | Date | August 4, 2022 |
|---|---|---|---|
| Title | Core Optical Technologies, LLC v. Nokia Corporation et al<br>Core Optical Technologies, LLC v. ADVA Optical Networking SE et al<br>Core Optical Technologies, LLC v. Cisco Systems, Inc. et al | | |

C.    Dr. Core's Ph.D Dissertation and TRW's Fellowship Program

In November 1992, Dr. Core applied to the Ph.D. Program of Electrical Engineering at the University of California, Irvine, with his stated field of interest as "Signal Processing and Communications Theory." Dkt. 83-2 ¶¶ 97, 98. Dr. Core included with his application letters of recommendation from Dan Azaren, one of Dr. Core's supervisors, and Greg Shreve, another TRW engineer. Dkt. 65-1 ¶¶ 46, 47; Dkt. 83-1 ¶¶ 46, 47; *see also* Dkt. 65-9 ("Shreve Letter"); Dkt. 65-10 ("Azaren Letter"). The Azaren Letter stated, "On one recent project, Mark was directly responsible for implementing a cross polarization cancellation system." Dkt. 65-10 at UCI0115. The letter also stated that Dr. Core's "analytical skills, both in the adaptive algorithm and RF circuit design, were key to finding some subtle hardware design problems." *Id*. The Shreve Letter stated, "In the CPC, an IR&D project, Mark used a floating point digital signal processor (DSP) to adaptively open the QPSK constellation in a 400 Mbps satellite-to-ground link." Dkt. 65-9 at UCI0112. On February 8, 1993, Dr. Core was accepted into the UCI Ph.D program, and he began taking classes in the Spring of 1993. Dkt. 83-2 ¶ 101; Dkt. 83-3 ¶ 11.

Between 1993 and 1994, TRW also accepted Dr. Core into its "Fellowship Program." *Id*. As part of the Fellowship Program, TRW paid tuition costs, a stipend, and a reduced, pro-rated salary for certain employee-engineers so that they could pursue an advanced degree while continuing to work at TRW part-time. Dkt. 65-1 ¶¶ 20, 22; Dkt. 83-1 ¶ 20; Dkt. 83-2 ¶ 102. As stated in the 1989 TRW Fellowship Policy Manual, "the degree program must be in an engineering or scientific field of study related to the employee's current or anticipated job responsibilities." Dkts. 83-12, Ex. 12; 87-15, Ex. 12 (sealed version); 88-10; 90-4 (sealed version) (collectively, "1989 TRW Fellowship Policy Manual") at NGC_0001368; *see also* Dkt. 65-24 ("McGuire Decl.") (explaining that declarant, Lisa McGuire, worked in human resources at TRW beginning in 1992); Dkt. 83-12, Ex. 5 at 137:4–142:11 ("McGuire Depo. Tr.") (stating the policy was consistent with McGuire's understanding of the TRW's Fellowship Program in 1993, but was unaware if the language of the policy had been changed by 1993); Dkt. 87-15, Ex. 5 (sealed version). The Fellowship Program also required participants to return to TRW for at least one year after completing their advanced degree, and to have a sponsor, which was typically their engineering or program manager, with whom the participant would meet regularly to discuss the participant's educational or research progress. Dkt. 83-2 ¶¶ 102, 103.

"When Dr. Core began his Ph.D studies at UCI, he did not have a particular thesis topic in mind." Dkt. 83-2 ¶ 115 (citing Dkt. 83-3 ¶¶ 17, 18). After reviewing literature at the UCI library and narrowing his potential topics to two options, Dr. Core chose to develop a dual-polarization ("DP") fiberoptic transmission system. Dkt. 83-2 ¶¶ 116, 117. His literature review included looking "at literature in the radio-frequency field, to see if [he] could locate techniques or concepts that might have application in the fiberoptic field." Dkt. 83-3 ¶ 18. In his review, Dr. Core did not find any reference to a DP fiberoptic transmission system. *Id*. ¶ 120. For his DP fiberoptic system, Dr. Core realized "cross-polarization interference cancellation might be applied to produce a practical and efficient receiver architecture for the dual-polarization optical signals." Dkt. 83-3 ¶ 22. "In late 1994, Dr. Core shared his DP optical XPIC idea with his thesis advisor, Dr. Tan," who "agreed that it was a promising topic for a thesis." *Id*. ¶ 122.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV19-2190 JAK (RAO)<br>SA CV20-1463 JAK (RAO)<br>SA CV20-1468 JAK (RAO) | Date | August 4, 2022 |
|---|---|---|---|
| Title | Core Optical Technologies, LLC v. Nokia Corporation et al<br>Core Optical Technologies, LLC v. ADVA Optical Networking SE et al<br>Core Optical Technologies, LLC v. Cisco Systems, Inc. et al | | |

In October 1994, Dr. Core drafted a paper, titled "Cross Polarization Cancellation for Coherent Fiber Optics," outlining the high-level structure of his DP fiberoptic system ("the 1994 Paper"). Dkt. 83-2 ¶ 121; Dkt. 83-4, Ex. 12 (the 1994 Paper); Dkt. 87-4, Ex. 12 (sealed version). The 1994 Paper begins with an "Introduction" section describing the use of CPCs in DP "bandlimited satellite communications channels" as follows:

> Frequency reuse by spatially polarized transmission is a method of increasing the capacity of a bandlimited satellite communications channel. The current means of avoiding interference in such a system is by transmitting two othogonally [sic] polarized signals. If two receive antennas have the same polarization and orientation, then each will respond to only one of the transmitted signals. The effectiveness of this technique depends on the amount of cross polarization discrimination that can be achieved, which is a function of the quality of the antenna systems and of the effect of the propagation medium on the polarization. Cross polarization cancelers have been developed to cancel these non-ideal effects at the receiver and therefore improve system performance.

Dkt. 83-4, Ex. 12 at COREOPT0019591. The "Introduction" section went on to state that, "the concept of cross polarization cancellation can be applied to fiber optic communications" by replacing the receive antennas with an optical receiver "[d]ue to the effective polarization sensitivity of the [DBORs.]" *Id*.

For his Fellowship Program, Dr. Core chose Pascal Finkenbeiner, who was his supervisor and manager at TRW, and who tasked Dr. Core with programming the CPC processor for the ADL project. Dkt. 83-2 ¶ 104; Dkt. 83-3 ¶ 56; Dkt. 83-10 ("Finkenbeiner Decl.") ¶ 2. Throughout his time in the Ph.D. program, Dr. Core and Finkenbeiner would discuss Dr. Core's Ph.D work. Dkt. 83-2 ¶ 104, 105, 108; Dkt. 83-3 ¶ 98; Dkt. 83-10 ¶ 6 ("I recall from those conversations that his work had to do with using cross-polarization cancellation in optical fiber transmission systems"). Dr. Core also continued to work part-time at TRW while completing his Ph.D. Dkt. 83-2 ¶ 130. However, Dr. Core did all of his Ph.D work at home or at the UCI library, and only used documents he obtained from the UCI library and his own pens, pencils, paper, and personal computer. *Id*. ¶¶ 132–134. According to Dr. Core, during this time, he did not work on CPCs, AEs, or systems that used these components at TRW. Dkt. 83-2 ¶ 183.

By December 1997, Dr. Core's work "was sufficiently complete to present it at an oral defense, which was successful." *Id*. ¶ 129. He then spent 1998 finalizing his work and drafting his final thesis. *Id*. On November 5, 1998, Dr. Core filed his completed thesis as a provisional patent application, which eventually issued as the '211 Patent. Dkt. 65-1 ¶¶ 57, 61; Dkt. 83-3 ¶ 100. On December 21, 1998, UCI approved and archived Dr. Core's final thesis ("the Thesis"). Dkt. 83-2 ¶ 129; *see also* Dkt. 83-4, Ex. 13 (the Thesis); Dkt. 87-4, Ex. 13 (sealed version). Like the 1994 Document, the Thesis is titled "Cross Polarization Interference Cancellation for Coherent Fiber Optics." Dkt. 83-4, Ex. 13 at COREOPT0044692; *see also id*. at COREOPT0044693 (listing copyright date as 1999). In the "Acknowledgment" section, the Thesis states, inter alia, "I would like to thank TRW for providing the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV19-2190 JAK (RAO)<br>SA CV20-1463 JAK (RAO)<br>SA CV20-1468 JAK (RAO) | Date | August 4, 2022 |
|---|---|---|---|
| Title | Core Optical Technologies, LLC v. Nokia Corporation et al<br>Core Optical Technologies, LLC v. ADVA Optical Networking SE et al<br>Core Optical Technologies, LLC v. Cisco Systems, Inc. et al | | |

fellowship program, and Dan Azaren, Pascal Finkenbeiner, and Greg Shreve for their support in making this work possible." *Id.* at COREOPT0044702. The Thesis also includes similar language to the "Introduction" section of the 1994 Document that is cited above. *Compare* Dkt. 83-4, Ex. 12 at COREOPT0019591, *with* Dkt. 83-4, Ex. 13 at COREOPT0044707 (removing the first two sentences of the first paragraph and adding, "A similar situation exists in microwave communication links where the bandwidth efficiency of a bandlimited channel is increased by transmitting two orthogonally polarized radio frequency signals."), and *id.* at COREOPT0044708 (adding to the second paragraph "Like microwave receive antenna, the coherent optical receiver is polarization sensitive, and only responds to the component of the signal with the same polarization as the optical local oscillator (LO).").

"Shortly after Dr. Core completed his thesis, he gave a physical copy of it to Mr. Finkenbeiner." Dkt. 83-2 ¶ 137. According to Dr. Core, "[s]ome time after" Dr. Core gave Finkenbeiner the Thesis, Dr. Core asked Finkenbeiner if he read the Thesis, to which Finkenbeiner replied he had. Dkt. 83-3 ¶ 99; *see also* Dkt. 83-10 ¶ 7 (stating Finkenbeiner does not recall receiving the Thesis, but "it would have been in keeping with his usual practice to give me a copy of the thesis"). Additionally, "sometime in the 1998-2000 timeframe," Dr. Core recalls telling his former project manager, Mark Garaway, that he had filed a patent application based on the Thesis, and that Garaway told Dr. Core TRW had no ownership interest in the invention. Dkt. 83-3 ¶ 101.

On March 19, 1999, Dr. Core obtained his Ph.D. Dkt. 83-2 ¶ 129.

        D.       Dr. Core's Post-Ph.D Work and Attempts to Commercialize the Invention

After completing his Ph.D work, Dr. Core continued to work at TRW as required by the Fellowship Program. During this time, Dr. Core hired a patent attorney, Mr. Schaal, to evaluate his work and to prepare a full patent application. Dkt. 83-3 ¶¶ 46, 47. On November 4, 1999, Mr. Schaal filed the non-provisional patent application that led to the '211 Patent. *Id.*

In 1999, Dr. Core attempted to commercialize the technology described in the '211 Patent and planned to create a company called Optiplex or Opnetix. Dkt. 65-1 ¶ 71; Dkt. 83-1 ¶ 71; Dkt. 83-2 ¶ 184. Dr. Core invited a TRW employee, Derek Kubo, to participate in the Optiplex effort. Dkt. 65-1 ¶ 72; Dkt. 83-2 ¶ 185. Dr. Core contacted several potential funders, but by "the middle of 2000," none had agreed to fund the venture. Dkt. 83-3 ¶ 117.

In May 2000, Dr. Core emailed Carles B. Roxlo at Lucent Technologies, Inc. to seek funding for Optiplex. Dkt. 65-1 ¶¶ 74–75; Dkt. 83-3 ¶ 117; Dkt. 65-15 at COREOPT0017643. Attached to the email was a paper Dr. Core wrote titled "Cross Polarization Interference Cancellation for Fiber Optic Systems." Dkt. 65-1 ¶ 74; Dkt. 65-15 at COREOPT0017646–COREOPT0017654. The paper is "essentially a modified version of [the] non-provisional application," and includes the same description found in the Thesis about applying a CPC solution, like the one found in RF satellite systems, to fiberoptic systems. Dkt. 65-15 at COREOPT0017646; Dkt. 83-3 ¶ 118. Roxlo responded that he had looked at the paper and

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV19-2190 JAK (RAO)<br>SA CV20-1463 JAK (RAO)<br>SA CV20-1468 JAK (RAO) | Date | August 4, 2022 |
|---|---|---|---|
| Title | Core Optical Technologies, LLC v. Nokia Corporation et al<br>Core Optical Technologies, LLC v. ADVA Optical Networking SE et al<br>Core Optical Technologies, LLC v. Cisco Systems, Inc. et al | | |

asked Dr. Core if he was "planning to do an experimental verification?" Dkt. 65-15 at COREOPT0017644. On June 2, 2000, Dr. Core replied he was "hoping to get funding to build a prototype unit," but also stated he had "built microwave cross polarization interference cancelers for satellite links at work, so the XPIC concept has been proven." *Id.* Additionally, Dr. Core stated that the system for satellite links was the same as for the optical links, "except that the optical front-end is replaced by orthogonally polarized antennas and low noise amplifiers." *Id.* Lucent ultimately did not fund Dr. Core's venture, and Dr. Core abandoned the venture "around late 2000." Dkt. 83-3 ¶ 120.

In August 2000, Dr. Core left TRW to work for Broadcom, Inc., but was terminated in December 2018 for asserting the '211 Patent against third-party optical equipment makers. Dkt. 83-3 ¶ 9. He is now retired. *Id*. In 2002, Northrop Grumman acquired TRW and its patent-ownership rights and assets. Dkt. 65-1 ¶ 4.

**III.    Analysis**

      A.    Legal Standards

           1.    Summary Judgment

Summary judgment is appropriate when, viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmoving party, there are no genuine issues of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law," such as those necessary to the proof of a defense or a claim; a dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable trier of fact to decide in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (internal citations omitted).

The moving party bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. Once the moving party meets its initial burden, the nonmoving party must set forth, by affidavit or as otherwise provided in Fed. R. Civ. P. 56, "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (internal quotation marks omitted). If the non-moving party fails to produce evidence sufficient to show a genuine issue of material fact, "the moving party is entitled to a judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 322–23.

Evidence presented by the parties in connection with a motion for summary judgment must be admissible. *See* Fed. R. Civ. P. 56(c)(2). In considering a motion for summary judgment, a court "does not assess credibility or weigh the evidence, but simply determines whether there is a genuine factual issue for trial." *House v. Bell*, 547 U.S. 518, 559–60 (2006). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *See Thornhill Pub. Co., Inc. v. Gen. Tel. & Elec. Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV19-2190 JAK (RAO)<br>SA CV20-1463 JAK (RAO)<br>SA CV20-1468 JAK (RAO) | Date | August 4, 2022 |
|---|---|---|---|
| Title | Core Optical Technologies, LLC v. Nokia Corporation et al<br>Core Optical Technologies, LLC v. ADVA Optical Networking SE et al<br>Core Optical Technologies, LLC v. Cisco Systems, Inc. et al | | |

2.    The Standing Requirement for a Patent Infringement Action

"[I]n a patent infringement action, 'the plaintiff must demonstrate that it held enforceable title to the patent at the inception of the lawsuit' to assert standing." *Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1364 (Fed. Cir. 2010) (quoting *Paradise Creations, Inc. v. UV Sales, Inc.*, 315 F.3d 1304, 1309–310 (Fed. Cir. 2003)). If "the original plaintiff lacked Article III initial standing, the suit must be dismissed, and the jurisdictional defect cannot be cured by the addition of a party with standing, nor by the subsequent purchase of an interest in the patent in suit." *Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*, 402 F.3d 1198, 1203 (Fed. Cir. 2005) (internal citations omitted).

"Applications for patent, patents, or any interest therein, shall be assignable in law by an instrument in writing." 35 U.S.C. § 261. "An assignment of an interest in an invention secured by letters-patent, is a contract, and like all other contracts is to be construed so as to carry out the intention of the parties to it." *Nicolson Pavement Co. v. Jenkins*, 81 U.S. 452, 456 (1871). An assignment of a patent is interpreted in accordance with the statutory and common law of contract. *Tri-Star Elecs. Int'l v. Preci-Dip Durtal SA*, 619 F.3d 1364, 1367 (Fed. Cir. 2010). Specifically, when an assignment agreement is involved, "state law governs the interpretation of contracts generally" but "the question of whether a patent assignment clause creates an automatic assignment or merely an obligation to assign is intimately bound up with the question of standing in patent cases" and is thus a "matter of federal law." *DDB Techs., L.L.C. v. MLB Advanced Media, L.P.*, 517 F.3d 1284, 1290 (Fed. Cir. 2008).

3.    California Law of Contract Interpretation

Under California law, contracts are interpreted to "give effect to the mutual intent of the parties as it existed at the time of contracting." *U.S. Cellular Inv. Co. v. GTE Mobilnet, Inc.*, 281 F.3d 929, 934 (9th Cir. 2002). "When a contract is reduced to writing, this intent 'is to be ascertained from the writing alone, if possible.'" *Id.* (quoting Cal. Civ. Code § 1639). "Interpretation of a contract is solely a question of law unless the interpretation turns upon the credibility of extrinsic evidence." *Badie v. Bank of Am.*, 67 Cal. App. 4th 779, 799 (1998). In general, "summary judgment is appropriate only if the contract or the contract provision in question is unambiguous." *Nat. Union Fire Ins. Co. v. Argonaut Ins. Co.*, 701 F.2d 95, 97 (9th Cir. 1983) (quoting *Castaneda v. Dura-Vent Corp.*, 648 F.2d 612, 619 (9th Cir. 1981)).

Where the parties dispute the meaning of specific contract language, "the court must decide whether the language is 'reasonably susceptible' to the interpretations urged by the parties." *Badie*, 67 Cal. App. 4th at 798 (quoting *Oceanside 84, Ltd. v. Fidelity Federal Bank*, 56 Cal. App. 4th 1441, 1448 (1997)). Where the contract is clear and express, its plain language governs. *See MacKinnon*, 31 Cal. 4th at 647-48. If the contract is susceptible to more than one reasonable interpretation, the analysis turns to which interpretation gives better effect to the mutual intention of the parties. *See Badie*, 67 Cal. App. 4th at 798; *Winet v. Price*, 4 Cal App. 4th 1159, 1165 (1992).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV19-2190 JAK (RAO)<br>SA CV20-1463 JAK (RAO)<br>SA CV20-1468 JAK (RAO) | Date | August 4, 2022 |
|---|---|---|---|
| Title | Core Optical Technologies, LLC v. Nokia Corporation et al<br>Core Optical Technologies, LLC v. ADVA Optical Networking SE et al<br>Core Optical Technologies, LLC v. Cisco Systems, Inc. et al | | |

B.    Application

Defendants assert that Plaintiff does not own the '211 Patent and, therefore, lacks standing to assert the '211 Patent. Specifically, Defendants contend that the '211 Patent was automatically assigned to TRW because Dr. Core's invention did not qualify as a Non-TRW Invention under the Agreement. The parties dispute whether the invention disclosed in the '211 Patent meets the requirements of the Non-TRW Invention Clause. The parties also dispute whether the third requirement of the Non-TRW Invention Clause requires an invention to meet either elements a) or b) or both for the invention to qualify as a Non-TRW Invention. The parties also dispute whether the Agreement automatically assigned the '211 Patent to TRW. The parties' disputes are addressed below.[4]

1.    <u>Evidentiary Objections</u>

The parties have raised several evidentiary objections, many of which concern form, rather than the substance of a statement. *See* Dkts. 80, 91, 99 (sealed version), 100.[5]  Where this Order expressly relies on evidence to which an objection has been raised, that objection is overruled. Where this order does not rely on challenged evidence, no ruling concerning admissibility is necessary.

2.    <u>The '211 Patent Does Not Meet the Requirements of the Non-TRW Invention</u>
      <u>Clause</u>

Defendants argue the '211 Patent does not fall within the Non-TRW Invention Clause under the

---

[4]  The parties present competing evidence of the conduct of Dr. Core, TRW, and Northrop Grumman relating to the Agreement. For example, the parties dispute whether Dr. Core properly disclosed his invention to TRW through his conversations with Finkenbeiner and Garaway, and whether he received approval to patent the invention on his own. Plaintiff presents evidence that Northrop Grumman, TRW's successor, knew of the '211 Patent, analyzed the ownership issue, yet never asserted ownership of the '211 Patent. Defendants reply with evidence that Northrop Grumman refused to acknowledge that Plaintiff owned the patent when Plaintiff requested written acknowledgement. Neither party argues that any specific contractual language is ambiguous. Although Plaintiff cites case law for the position that "the interpretation of an ambiguous contract which requires consideration of extrinsic evidence is a question of fact for the jury," this is insufficient to provide notice of what specific contract language Plaintiff claims to be ambiguous. *See* Dkt. 83 at 14 (citing *Coremetrics, Inc. v. Atomic Park.com, LLC*, No. 04-0222 EMC, 2005 WL 3310093, at *3 (N.D. Cal. Dec. 7, 2005)). Rather, all but one of the parties' disputes appear to be based on the proper application of the plain meaning of the terms in the Agreement. *See* Section III.B.2.b.(1) (discussing disputed interpretation of the third requirement in the Non-TRW Invention Clause).

[5]  For example, Plaintiff objects to every exhibit attached to Defendants' reply brief as being improper rebuttal evidence because it was submitted with Defendants' reply brief, notwithstanding that one of these same exhibits was presented in support of Plaintiff's opposition brief. Further, Defendants submitted a 131-page list of objections including many that assert, unpersuasively, that a particular statement is an improper legal conclusion. *See* Dkt. 91 at 12 (objecting that "TRW did not provide, or provide funding for, the computer on which I ran the simulations, or the software" was an improper legal conclusion).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV19-2190 JAK (RAO)<br>SA CV20-1463 JAK (RAO)<br>SA CV20-1468 JAK (RAO) | Date | August 4, 2022 |
|---|---|---|---|
| Title | Core Optical Technologies, LLC v. Nokia Corporation et al<br>Core Optical Technologies, LLC v. ADVA Optical Networking SE et al<br>Core Optical Technologies, LLC v. Cisco Systems, Inc. et al | | |

Agreement because it does not meet any of the elements of that Clause. Under the Non-TRW Invention Clause, at least three requirements must be met for an invention to be a Non-TRW Invention: 1) no equipment, supplies, facility, or trade secret information of TRW were used in the invention process; 2) the invention was developed entirely on the employee's own time; and 3) (a) the invention does not relate to the business of TRW or to TRW's actual or demonstrably anticipated research or development, or (b) does not result from any work performed by the employee for TRW. The parties dispute whether the third prong requires an invention to meet either element (a) or (b) or both of them to be a Non-TRW Invention. Plaintiff also contends that the invention satisfies each of these elements, or, alternatively, there is at least a genuine dispute of material fact whether the invention is a Non-TRW Invention.

As explained further below, because there is no genuine dispute that the invention disclosed in the '211 Patent resulted from Dr. Core's work for TRW and related to TRW's business, the '211 Patent does not satisfy the requirements of the Non-TRW Invention Clause in the Agreement.

a)      Defendants Bear the Burden of Proving TRW Owns the '211 Patent

Defendants bear the burden of proving TRW owns the '211 Patent. *See SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1327–28 (Fed. Cir. 2010). Specifically, where an employee assigns his invention and records the assignment, that "creates a presumption of validity as to the assignment and places the burden to rebut such a showing on one challenging the assignment." *Id.* at 1328. Thus, although California law places the burden on "the employee" to prove "[an] assignment does not apply to an invention which qualifies fully [to be retained by the employer] under the provisions of Section 2870," the Federal Circuit has found this statute does not apply when the parties dispute who has ownership of a patent under a contract, as opposed to when they dispute the enforceability of the contract. *Id.* at 1327 n.6 (citing Cal. Lab. Code §§ 2870, 2872). Because Dr. Core and Plaintiff recorded the assignment of the '211 Patent, the burden is on Defendants to prove that this assignment is not valid.

b)      There is a Genuine Dispute of Material Fact Whether the '211 Patent Satisfies the Third Requirement of the Agreement

(1)      The Non-TRW Invention Clause Requires the Invention to Satisfy Either Elements a) or b) of the Third Requirement to Qualify as a Non-TRW Invention

The Non-TRW Invention Clause of the Agreement, which defines what inventions a TRW employee is not required to assign to TRW, includes three requirements. The third applies to an invention: "(a) which does not relate (1) to the business of TRW or (2) to TRW's actual or demonstrably anticipated research or development, *or* (b) which does not result from any work performed by me for TRW." Dkt. 65-5 at COREOPT0007678 (emphasis added). The parties appear to agree that California law governs the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV19-2190 JAK (RAO)<br>SA CV20-1463 JAK (RAO)<br>SA CV20-1468 JAK (RAO) | Date | August 4, 2022 |
|---|---|---|---|
| Title | Core Optical Technologies, LLC v. Nokia Corporation et al<br>Core Optical Technologies, LLC v. ADVA Optical Networking SE et al<br>Core Optical Technologies, LLC v. Cisco Systems, Inc. et al | | |

Agreement.[6]  The parties dispute whether a Non-TRW Invention needs to meet either the "does not relate to" or "does not result from" elements or both.

The Non-TRW Invention Clause of the Agreement unambiguously requires an invention to meet only one of the two requirements. *See Applera Corp.–Applied Biosystems Grp. v. Illumina, Inc.*, 375 F. App'x 12, 15–18 (Fed. Cir. 2010). In *Applera*, the Federal Circuit held that the following language in an employee agreement was unambiguous and did not require an employee to prove that an invention meets both elements under California law: "(i) it does not relate to the business or actual or demonstrably anticipated research or development of the Company, or (ii) it does not result from any work performed by [him] for the Company." *Id.* at 15. *Applera* determined that the use of "or" rather than "and" showed that an invention only had to meet one of the two elements, and "California law requires [courts] to construe contractual obligations 'most strongly against the party who caused the uncertainty to exist.'" *Id.* at 17 (quoting Cal. Civ.Code § 1654). The Non-TRW Invention Clause is nearly identical to the relevant clause of the employee agreement in *Applera*. Although *Applera* is nonprecedential and non-binding, *see Hytera Comms. Co. Ltd. v. Motorola Sols., Inc.* 841 Fed. App'x. 210, 216 (Fed. Cir. 2021), its analysis is persuasive.

*Cubic Corp. v. Marty*, 185 Cal. App. 3d 438 (Cal. Ct. App. 1986) does not warrant a different outcome. There, the Court of Appeal evaluated the text of Cal. Lab. Code § 2870 that was in place at that time. It included identical language to the Non-TRW Invention Clause and required inventions to meet both conditions to make an assignment provision unenforceable. *Id.* at 17. *Cubic Corp.* concluded that, to hold otherwise, would render the "related to" element "mere surplusage." *Id.* In *Applera*, the Federal Circuit distinguished *Cubic*, based on the view that § 2870 does not confer any rights on employers, but rather protects employees. 375 F. App'x at 17. The Federal Circuit also noted that the employee agreement did not incorporate § 2870 by reference, and for that reason, the employer "did not 'avail itself' of any rights envisioned by this statute." *Id.*; *c.f. Cadence Design Sys., Inc. v. Bhandari*, No. 07-00823 MHP, 2007 WL 3343085 (N.D. Cal. Nov. 8, 2007) (the scope of the contract is coextensive with the scope of § 2870 under *Cubic* where a contract "closely tracks the language of section 2870" and "expressly references the statute").[7] Similarly, because the Agreement here does not incorporate § 2870 by reference, it does not import any of the rights stated there.

Accordingly, the Non-TRW Invention Clause requires an invention to satisfy only one of the "does not relate to" and "does not result from" elements to be a Non-TRW Invention.

---

[6]  Although the parties do not state expressly that the Agreement is governed by California law, they cite case law interpreting contracts under California law. *See generally* Dkts. 65, 83.

[7]  It is also significant that *Applera* noted that, "the California legislature amended § 2870 in 1986 following the *Cubic* decision" so it "clearly requires that an invention meet both criteria to render an agreement unenforceable." 375 F. App'x at 17 n.2 (citing Cal. Lab. Code § 2870 (West 1986)). That amendment supports the view that the California legislature did not believe that the original language of § 2870 unambiguously required an invention to meet both elements.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV19-2190 JAK (RAO)<br>SA CV20-1463 JAK (RAO)<br>SA CV20-1468 JAK (RAO) | Date | August 4, 2022 |
|---|---|---|---|
| Title | Core Optical Technologies, LLC v. Nokia Corporation et al<br>Core Optical Technologies, LLC v. ADVA Optical Networking SE et al<br>Core Optical Technologies, LLC v. Cisco Systems, Inc. et al | | |

(2)     The '211 Patent Related to TRW's Business

Defendants assert that the invention disclosed in the '211 Patent related to TRW's business. According to Defendants, "Courts interpret the phrase 'related to' broadly." Dkt. 65 at 21 (citing *Cadence Design Sys.*, 2007 WL 3343085, at \*5). Defendants argue that TRW's business related to CPCs, as evidenced by the RF satellite transmission projects Dr. Core worked on, and TRW continued to work on CPCs while Dr. Core pursued his Ph.D. *Id.* Defendants also argue that Dr. Core continued working on "projects related to the same subject matter at TRW over the course of a decade." *Id.* As Defendants contend, TRW's work on CPC "contributed over $150 million to its business and awarded that team (including Core) one of the company's highest honors (the annual TRW Chairman's Award) for that work." *Id.* at 21–22 (citing Dkt. 65-1 ¶¶ 54, 56; Dkt. 65-25 ¶ 10). Moreover, Defendants highlight that the PTO issued a patent to TRW "stemming from that very work." *Id.* at 22 (citing Dkt. 65-1 ¶¶ 52, 53; Dkt. 65-25 ¶ 9; U.S. Patent No. 5,692,014).

Defendants also assert that it is irrelevant that the XPIC of the '211 Patent is used in fiberoptic communication systems instead of RF communication systems. Specifically, Defendants argue that the in some embodiments of the '211 Patent, the devices "initially receive an optical signal, [but] can then convert the signal to a RF signal *and perform cross polarization interference cancellation—the supposedly inventive feature—on that RF signal.*" *Id.* at 22 (emphasis in original) (citing Dkt. 65-1 ¶¶ 84–86; '211 Patent at 8:29–31, 10:27–33; Dkt. 65-3 at 256:1–5, 256:15–18). Additionally, TRW "was heavily involved in the optical communications business," as evidenced by TRW's work "developing 10 Gigabit and 40 Gigabit optical receivers" and tackling associated "interference issues." *Id.* (citing Dkt. 65-1 ¶¶ 88–91; Dkt. 65-33 ("Oki Decl.") ¶¶ 3–6).

Plaintiff responds that TRW did not have an actual business in CPCs because it used "an off-the-shelf CPC" for its RF satellite transmission projects. Dkt. 83 at 23 (citing Dkt. 83-2 ¶¶ 159, 160). Plaintiff also argues RF systems and fiberoptic systems are "entirely different," and TRW did not have any business or any plans to do business in fiberoptics "—let alone **dual-polarized, coherent** fiberoptic communication systems—prior to November 1998." *Id.* (emphasis in original) (Dkt. 83-3 ¶ 97; Dkt. 83-6 ¶¶ 86, 91; Dkt. 83-8 ¶¶ 28, 31; Dkt. 83-10 ¶ 10). Citing Dr. Kahn's testimony, Plaintiff argues that the disclosure of the "IF XPIC embodiment [that] operates at radio frequencies does not make the '211 invention an obvious or straightforward extension of TRW's satellite radio systems" because the kinds of impairments to the signals are different. *Id.* at 23–24 (citing Dkt. 83-6 ¶¶ 97–13). Further, Plaintiff argues that Defendants' cited evidence that TRW worked in fiberoptics does not show that TRW worked on correcting transmission errors in fiberoptics or on fiberoptic XPICs. *Id.* at 24 (citing Dkt. 65-33 ¶ 6; Dkt. 83-2 ¶¶ 192–196; Dkt. 83-7, Ex. 11 ("Oki Depo. Tr.") at 41:22–42:8, 43:24–44:5, 56:9–13, 75:8–76:8, 92:10–22, 99:9–16, 109:3–111:2; Dkt. 87-10, Ex. 11 (sealed version)).

Defendants reply that Plaintiff's arguments stem from its "litigation manufactured, self-serving definition of TRW's business and research." Dkt. 88 at 9. Defendants assert that it is undisputed that Dr. Core conceived of his invention after researching solutions in RF frequency literature, and "If RF XPIC work

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV19-2190 JAK (RAO)<br>SA CV20-1463 JAK (RAO)<br>SA CV20-1468 JAK (RAO) | Date | August 4, 2022 |
|---|---|---|---|
| Title | Core Optical Technologies, LLC v. Nokia Corporation et al<br>Core Optical Technologies, LLC v. ADVA Optical Networking SE et al<br>Core Optical Technologies, LLC v. Cisco Systems, Inc. et al | | |

was sufficient to serve as the foundation for his optical XPIC work, then it is also 'related to' that work."
*Id*. (citing Dkt. 83-3 ¶¶ 18, 25, 26 31, 32; Dkt. 83-4, Ex. 12 at COREOPT0019591; Dkt. 83-4, Ex. 17 at
COREOPT0001432; Dkt. 87-6, Ex. 17 (sealed version)). Defendants also argue that regardless of
whether the RF XPIC disclosed in the '211 Patent "contains improvements to address additional problems
presented by optical signals," improvements to existing technology are still "related to" existing
technology. *Id*. Finally, Defendants emphasize that the 1989 TRW Fellowship Policy Manual required Dr.
Core's work to be in a "field of study related to the employee's current or anticipated job responsibilities,"
and in a "technical field related to" TRW. *Id*. at 9–10 (citing Dkt. 83-12, Ex. 12 at NGC_0001368,
NDC_0001148).

There is no genuine dispute that the '211 Patent related to TRW's business. "Courts interpreting
employee assignment agreements in the context of section 2870 have construed the 'related to' phrase
broadly." *Cadence Design Sys*., 2007 WL 3343085, at *5 (citing *Cubic Corp*.) (granting summary
judgment that invention was related to employee's work under employee assignment agreement).
Although the Agreement is not interpreted in the context of section 2870 here, the Agreement also uses
the phrase "relate to" and is interpreted in a similar context, i.e., who owns the patent.

It is undisputed that TRW developed RF communication systems throughout the 1990's. As stated above,
TRW offered those system for sale with CPCs and AEs to correct for errors in the transmitted signals,
including XPI. In the mid to late 1990's, TRW also worked on fiberoptic communication systems and sold
fiberoptic receiver hardware, as reflected by three published papers discussing TRW's work and the
testimony of Aaron Oki, a TRW employee who worked on those papers. *See* Dkt. 65-33 ¶¶ 3–6;
Dkt. 65-34; Dkt. 65-35; Dkt. 65-36 (document dated June 1, 1998, discussing TRW's optoelectronic
photodetector receiver with clock and data recovery and using "microwave techniques" to enable a
designer "to fully exploit the device performance without incurring degradation due to interconnect and
device parasitic effects"); *see also* Dkt. 83-7, Ex. 11 at 45:18–48:16; 51:6–21; 52:7–23; 56:25–57:15;
61:14–62:3; 62:22–63:1; 64:20–65:24; 66:7–73:19; 85:1–86:7; 92:10–15; 94:12–96:11; 97:4–99:20;
109:6–110:4; 230:11–231:3.[8]

It is also undisputed that the '211 Patent claims the use of XPICs in DP fiberoptic receiver systems to
correct XPI and dispersion issues. The evidence shows that TRW would have been interested in
redesigning its own fiberoptic receiver systems to implement the DP fiberoptic system in the '211 Patent
because "whether it's RF or optical," TRW was "always interested in the capability of transmitting more
data … efficiently over … given amounts of electromagnetic spectrum," as TRW's end users were "just
interested [in] higher amounts of data." Dkt. 83-7, Ex. 11 at 98:18–99:8. Further, as Defendants point out,
the 1989 TRW Fellowship Policy Manual states that Dr. Core's Ph.D needed to be in a "field of study
related to the employee's current or anticipated job responsibilities," and in a "technical field related to"
TRW. Dkts. 83-12, Ex. 12 at NGC_0001368, NDC_0001148; *see also* Dkt. 83-2 ¶ 112 (asserting that Dr.

---

[8] Plaintiff's objections to the Oki Decl. are overruled. *See* Dkt. 80 at 5 (Objections No. 9 and 10); *see also* Dkt. 83-
7, Ex. 11 at 20:10–20; 51:6–53:22; 56:25–57:15; 99:9–16.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV19-2190 JAK (RAO)<br>SA CV20-1463 JAK (RAO)<br>SA CV20-1468 JAK (RAO) | Date | August 4, 2022 |
|---|---|---|---|
| Title | Core Optical Technologies, LLC v. Nokia Corporation et al<br>Core Optical Technologies, LLC v. ADVA Optical Networking SE et al<br>Core Optical Technologies, LLC v. Cisco Systems, Inc. et al | | |

Core's work was in a field "related to the employee's current or anticipated job responsibilities"); Dkts. 83-12, Ex. 6; 87-15, Ex. 6 (sealed version); 88-6; 90-2 (sealed version) (collectively, "Northrop Gruman's 2005 Fellowship Program Document") at NGC_0001148 (titled, "Full-Time Doctoral Fellowship Program Award Information," stating "Technical field related to Northrop Grumman" under "Description"), NGC_0001149 ("This program enables selected members of the professional technical staff who have been Northrop Grumman employees for a minimum of one year to obtain a Doctoral degree at a local school of their choice in a technical field related to Northrop Grumman activities.").[9]

Plaintiff has not created a genuine issue of material fact that the invention *related to* TRW's business. Plaintiff argues that certain employees, including Dr. Core, were unaware of TRW's fiberoptics work. However, as Dr. Core testified, TRW was an aerospace/defense contractor and information was often given only on a "need to know" basis. Dkt. 83-3 ¶ 50. Thus, TRW employees who did not work on TRW's classified fiberoptic receiver systems were not to have been aware of them. Nevertheless, Dr. Core's lack of awareness does not address the undisputed evidence in TRW's three published papers. Plaintiff also argues that TRW never tried to develop the precise invention in the '211 Patent. As Dr. Core testified, however, prior to his Ph.D work, no one had tried to develop a DP fiberoptic receiver system using an XPIC; that does not mean that such a system was unrelated to TRW's business. *Id*. ¶ 23.

Accordingly, the '211 Patent is related to TRW's business.

> (3)    There is a Genuine Question of Material Fact Whether the '211 Patent Resulted from Dr. Core's Work for TRW

Defendants assert that the '211 Patent was a direct result of Dr. Core's work for TRW for two reasons. *First*, Defendants argue that TRW's Fellowship Program required that Dr. Core's research for his Ph.D, which led to the '211 Patent, be related to his work for TRW. Dkt. 65 at 23 (citing Dkt. 65-1 ¶¶ 20–25, 31–34; Dkt. 65-24 ¶¶ 7–9; Dkt. 65-3 at 69:17–70:6, 70:25–71:9, 73:22–75:17; 96:23–97:4). Thus, according to Defendants, all of Dr. Core's work during the Ph.D program was work for TRW. *Id*.

*Second*, Defendants argue that Dr. Core worked "extensively" on CPCs at TRW, as shown by the 1993 Article acknowledging Dr. Core's work on the RF satellite receiver system and by Dr. Core's two recommendation letters to UCI crediting his work on CPCs. *Id*. (citing Dkt. 65-9 at UCI0114; Dkt. 65-10 at UCI0115). In further support of this position, Defendants cite the testimony of TRW's CPC development project leader, Keith Yamashiro. He stated that the "algorithms implemented by Dr. Core at TRW served as the 'brains' [or 'heart'] of TRW's cross polarization interference cancellation system," and were the software that controlled the CPCs hardware. *Id*. (citing Dkt. 65-25 ¶ 7); *see also* Dkt. 83-12, Ex. 1

---

[9] Plaintiff has objected to Defendants use of the 1989 TRW Fellowship Policy Manual, (Dkt. 100 at 12) and the Northrop Grumman's 2005 Fellowship Program Document (*Id*. at 10), but produced the same exhibits in support of its opposition to the Motion, (Dkt. 83-12, Ex. 6; Dkt. 83-12, Ex. 12). Plaintiff's objections are also substantively unpersuasive. Therefore, Plaintiff's objections to this exhibit are overruled.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV19-2190 JAK (RAO)<br>SA CV20-1463 JAK (RAO)<br>SA CV20-1468 JAK (RAO) | Date | August 4, 2022 |
|---|---|---|---|
| Title | Core Optical Technologies, LLC v. Nokia Corporation et al<br>Core Optical Technologies, LLC v. ADVA Optical Networking SE et al<br>Core Optical Technologies, LLC v. Cisco Systems, Inc. et al | | |

("Yamashiro Depo. Tr.") at 70:19–71:5 (testifying that he referred to it as the "heart," not the "brains"); Dkt. 87-15, Ex. 1 (sealed version). According to Defendants, the '211 Patent discloses and claims those same algorithms, e.g., the DSD and "mean square error" algorithms. *Id*. at 23 (citing '211 Patent at 8:29–31, 16:24–27, Claim 35; Dkt. 65-25 ¶ 7; Dkt. 65-28). Defendants also assert that Claim 30 of the '211 Patent "recites the same architecture as the TRW [CPC][.]" *Id*. at 24 (citing '211 Patent, Claim 30; Dkt. 65-3 at 83:11–24, 125:15–18, 127:5–130:3; Dkt. 65-23 at Fig. 1; Dkt. 65-25 ¶ 6; Dkt. 65-27 at COREOPT00010661). Defendants also highlight that, in his efforts to commercial the '211 Patent, Dr. Core stated that "'the XPIC concept ***has been proven***' by his work at TRW" and attempted to recruit Kubo, who is described in one TRW document as being "intimately familiar with the DBS / AE / CPIC product line." *Id*. at 11, 24 (emphasis in original) (citing Dkt. 65-3 at 198:9–16, 206:13–207:16, 217:18–218:4; Dkt. 65-15 at COREOPT0017644; Dkt. 65-14 at COREOPT0010628; Dkt. 70-4 (sealed version); Dkt. 65-25 ¶ 11).

In response, Plaintiff argues that the '211 Patent could not be a result of Dr. Core's work for TRW because Dr. Core "conceived the invention based solely on his review of literature at the UCI library." Dkt. 83 at 20 (citing Dkt. 83-3 ¶¶ 19–30). Plaintiff asserts that Dr. Core's literature review could not have related to his work at TRW because he never worked on fiberoptics at TRW. *Id*. (citing Dkt. 83-3 ¶ 17). Plaintiff also argues that the remainder of Dr. Core's Ph.D research and process was unrelated to his work at TRW both before and after he joined the Fellowship Program. *Id*. (citing Dkt. 83-3 ¶¶ 8, 30–44, 49–55).

Plaintiff also argues that, Dr. Core did not "learn anything about XPI even in *radio* signals—let alone optical signals—from his TRW work," "do *any* work on the hardware for the CPC at TRW," or "do *any* work on the overall system design for the system(s) in which the CPC was used." *Id*. at 20–21 (emphasis in original) (citing Dkt. 83-3 ¶¶ 67, 74, 82a, 85, 112). Nor did Dr. Core "use *any* information—let alone proprietary or trade secret information—that [he] learned at TRW to develop … [his] invention." *Id*. (emphasis in original) (citing Dkt. 83-3 ¶ 85). Instead, it claims that Dr. Core's only work on "the CPC project" was to program the "standard, well-known, prior art [DSD] algorithm" into a processor, which Plaintiff argues "has nothing to do with 'cross-polarization cancellation.'" *Id*. at 20–21 (citing Dkt. 83-3 ¶¶ 67–74; Dkt. 83-6 ¶¶ 43–46). Plaintiff asserts that the DSD algorithm "simply compares detected data to expected values, computes the difference as an 'error,' and drives the tap weights to the value that produces the minimum error." *Id*.

Plaintiff next relies on the "structural differences between TRW's CPC and the '211 patent's XPIC." *Id*. at 21. Specifically, Plaintiff asserts that TRW's CPC used a "C-E" structure, while the '211 Patent XPIC used a "PAR" structure. *Id*. (citing Dkt. 83-6 ¶¶ 63–82 (explaining the two structures and their differences)). Plaintiff also asserts that the '211 Patent XPIC "used frequency-dependent filters" "necessary to correct optical effects such as CD and PD," while "TRW's CPC did not use filters," but rather "single-tap 'coefficients' … incapable of correcting such optical effects." *Id*. (citing Dkt. 83-6 ¶¶ 80, 81). Plaintiff argues that those structural differences show that the invention was the result of Dr. Core's independent research, not his work at TRW. Plaintiff also argues that Claim 30 does not recite the same architecture as TRW's CPC because it recites optical components. *Id*. Plaintiff next contends that the DSD algorithm

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV19-2190 JAK (RAO)<br>SA CV20-1463 JAK (RAO)<br>SA CV20-1468 JAK (RAO) | Date | August 4, 2022 |
|---|---|---|---|
| Title | Core Optical Technologies, LLC v. Nokia Corporation et al<br>Core Optical Technologies, LLC v. ADVA Optical Networking SE et al<br>Core Optical Technologies, LLC v. Cisco Systems, Inc. et al | | |

and "mean square error algorithm" were well-known and unclaimed in the '211 Patent. *Id*. at 21–22 (citing Dkt. 83-3 ¶¶ 68, 73, 130–134; Dkt. 83-6 ¶¶ 43, 84, 108). Thus, according to Plaintiff, the '211 Patent could not have related to Dr. Core's work on these algorithms because "[t]he patent office has repeatedly recognized that Dr. Core's patent discloses a novel improvement over prior art RF XPICs and corresponding algorithms." *Id*. at 22 (citing Dkt. 83-6 ¶ 101; Dkt. 83-12, Exs. 8–10 (decisions denying IPR review)).

In response to Defendants' cited evidence, Plaintiff argues that the two recommendation letters are hearsay statements that conflict with the testimony of Dr. Core, Kubo, Finkenbeiner, and Dr. Joseph Kahn who is Plaintiff's technical expert. *Id*. (citing Dkt. 83-3 ¶¶ 82a, 112, 129; Dkt. 83-6 ¶¶ 84–89; Dkt. 83-8 ("Kubo Decl.") ¶¶ 28–31; Dkt. 87-11 (sealed version); Dkt. 83-10 ¶ 10). Plaintiff also asserts that Dr. Core's statement that the "XPIC concept has been proven" in the TRW CPC "was simple 'a bit of salesmanship,' trying to give Mr. Roxlo 'some confidence that, because RF XPICs had been proven, Dr. Core's 'pioneering optical XPIC invention might work." *Id*. at 12 (citing Dkt. 83-3 ¶¶ 117–122).

Defendants reply that the evidence shows Dr. Core's "inventive work 'resulted' from, i.e., 'occurred or followed as a consequence of,'" his work on CPCs at TRW. Dkt. 88 at 6 (citing Dkt. 88-9 (Oxford Languages definition of "result")). Specifically, Defendants emphasize that Dr. Core's work "is corroborated by a memo that Core himself penned, letters of recommendation written by Core's superiors, and a published journal article." *Id*. (citing Dkt. 65-1 ¶¶ 42, 43, 46–51). Defendants also emphasize that Dr. Core "corroborated the connection between his work at TRW and his invention" in his attempts to commercialize the invention, and argue that his present attempts to characterize those statements as "salesmanship" are "conclusory allegations unsupported by factual data." *Id*. (quoting *Hansen v. United States*, 7 F.3d 137, 138 (9th Cir. 1993)) (citing Dkt. 65-1 ¶¶ 74–76; Dkt. 83-3 ¶¶ 118–120). Defendants further argue that Finkenbeiner's declaration fails to establish personal knowledge of many of the things Dr. Core asserts, Dr. Core's alleged conversation with Garaway is inadmissible hearsay, and Garaway was "not authorized to assess whether TRW had rights to Core's invention." *Id*. at 7 (citing Dkt. 83-10 ¶¶ 6, 7, 11; Dkt. 88-1 ("Finkenbeiner Decl. II"); Dkt. 65-1 ¶ 70). Defendants also argue that the 1989 TRW Fellowship Policy Manual requires Fellowship participants to pursue an "engineering or scientific field of study related to the employee's current or anticipated job responsibilities." *Id*. at 6 (citing Dkt. 88-10 at NGC_0001368).

Finally, Defendants argue that Plaintiff "effectively argues, without legal support, that an invention can only 'result from' work performed by an employer *if the two are identical*," which "would render the 'result[ed] from' language surplusage." *Id*. at 8 (emphasis in original) (citing *ACL Techs., Inc. v. Northbrook Prop. & Cas. Ins. Co.*, 17 Cal. App. 4th 1773, at 1785, 22 Cal. Rptr. 2d 206 (1993), as modified (Sept. 21, 1993)).

There is a genuine dispute of material fact whether the invention as defined by the claims of the '211 Patent resulted from Dr. Core's work on CPCs at TRW. Whether the claims of the '211 Patent "resulted from" Dr. Core's work at TRW is a broader inquiry than whether his work at TRW anticipates or renders

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV19-2190 JAK (RAO)<br>SA CV20-1463 JAK (RAO)<br>SA CV20-1468 JAK (RAO) | Date | August 4, 2022 |
|---|---|---|---|
| Title | Core Optical Technologies, LLC v. Nokia Corporation et al<br>Core Optical Technologies, LLC v. ADVA Optical Networking SE et al<br>Core Optical Technologies, LLC v. Cisco Systems, Inc. et al | | |

obvious the claims of the '211 Patent. Black's Law Dictionary defines "result" as "[t]o be a physical, logical, or legal consequence; to proceed as an outcome or conclusion." RESULT, Black's Law Dictionary (11th ed. 2019). Similarly, Defendants cite the following definition of "result": "to occur or follow as the consequence of something." *See* Dkt. 88-9.[10] It is unclear how much of the '211 Patent, e.g., the specification, the claims, or other must be a result or consequence of Dr. Core's work for TRW.

Plaintiff equates the inquiry with the novelty requirement under 35 U.S.C. § 102. Plaintiff emphasizes that the '211 Patent "could not have 'result[ed]' from' [Dr. Core's] work programming the DSD algorithm at TRW" because it "discloses a novel improvement over prior art RF XPICs and corresponding algorithms." Dkt. 83 at 22. Plaintiff appears to go beyond the novelty requirement by arguing that the structure of the XPIC disclosed in the specification of the '211 Patent was a novel improvement over the structure of TRW's CPC regardless of whether that precise structure is recited in the claims. *Compare* Dkt. 83 at 21, *with* '211 Patent, Claims 1–37.

As Defendants argue, Plaintiff's interpretation is too broad. Accepting Plaintiff interpretation would require Defendants to show that every detail of the invention disclosed *in the specification* was a result of Dr. Core's work for TRW, notwithstanding that many of these aspects are unclaimed. Instead, the claims of the '211 Patent govern. *See Gen. Foods Corp. v. Studiengesellschaft Kohle mbH*, 972 F.2d 1272, 1274 (Fed. Cir. 1992) ("It is to the claims of every patent, therefore, that we must turn when we are seeking to *determine what the invention is, the exclusive use of which is given to the inventor by the grant* provided for in the statute,—'He can claim nothing beyond them.'") (emphasis in original) (quoting *Motion Picture Patents Co. v. Universal Film Mfg. Co.*, 243 U.S. 502, 510 (1917)). Moreover, the claims of the '211 Patent need not be identical to Dr. Core's work at TRW for them to have been a result of his work, so long as they were a logical or natural consequence of that work.[11]

The characterization of Dr. Core's work at TRW by both Plaintiff and Dr. Core, shows that he worked on cross-polarization interference cancellation in RF communication systems. It is undisputed that, prior to joining TRW, Dr. Core knew of the DSD algorithm, but had not worked on cross polarization cancellation technology. Dkt. 65-1 ¶ 45; Dkt. 83-3 ¶ 68. Dr. Core worked on TRW's RF satellite transmission projects between 1990 and 1993. As part of those projects, Dr. Core "was tasked with developing and programming" a DSP "to provide digital control words for a [CPC] in a satellite receive system" to "control the 'tap weights' within the CPC." Dkt. 83-3 ¶ 56. To do this, Dr. Core "program[med] the [DSD] algorithm into the CPC processor, to generate tap weights that would minimize the mean squared error of the data." *Id.* ¶ 65. As Dr. Kahn explains, the CPC uses the two single-taps with the updated tap weights "to modify the amplitude and/or phase of the RHCP and LHCP signals, in order to attempt to correct cross-polarization distortion (i.e., the extent to which the original RHCP signal leaked into the LCHP signal, and

---

[10] In an unpublished opinion, a California Court of Appeal held that "[d]ictionary definitions are not extrinsic evidence: they are merely interpretive tools used to determine the meaning of contract language." *Nordhoff Way, LLC v. Walgreen Co.*, No. B263661, 2016 WL 6247664, at *8 (Cal. Ct. App. Oct. 26, 2016).

[11] Neither party asserts that there are pending claim construction disputes that preclude the resolution of the Motion.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV19-2190 JAK (RAO)<br>SA CV20-1463 JAK (RAO)<br>SA CV20-1468 JAK (RAO) | Date | August 4, 2022 |
|---|---|---|---|
| Title | Core Optical Technologies, LLC v. Nokia Corporation et al<br>Core Optical Technologies, LLC v. ADVA Optical Networking SE et al<br>Core Optical Technologies, LLC v. Cisco Systems, Inc. et al | | |

*vice versa*).” Dkt. 83-6 ¶ 29. According to Dr. Core, he continued to work on the tap weight processor after 1998. Dkt. 63-5 at 149:1–10.

Dr. Core programmed the CPC processor with the specific version of the DSD algorithm described in the prior art Widrow Paper. Dkt. 83-3 ¶ 68. Dr. Core knew that the CPC used two channels each with a single tap complex phase modulator to program the DSD algorithm. *See id*. ¶¶ 69, 76, 116; Dkt. 93:9–25. Dr. Core also knew that the CPC system received feedback from the DBS to program the DSD algorithm. *See* Dkt. 83-3 ¶¶ 72, 76; *see also* Dkt. 65-28 at NGC_0000038; Dkt. 65-3 at 89:3–12; 109:18–110:3. Dr. Core also testified that, although he knew the DSD algorithm was correcting errors caused by physical phenomena, he did not know what faults the algorithm was correcting. Thus, he stated that “[i]t did not matter what physical phenomena caused the error—whatever the source of error, the DSD algorithm would attempt to minimize it by driving the tap weight toward the point of minimum error.” Dkt. 83-3 ¶ 74. This shows that Dr. Core knew the DSD algorithm controlling the CPC could correct errors regardless of what physical phenomena was causing them.

Dr. Core was also “asked to modify the processor to [] generate tap weights for” the AE by using “the DSD algorithm to generate the control words for the AEs, as it did for the CPC.” *Id*. ¶¶ 75, 76. As Dr. Kahn explains, each AE receives the corrected RHCP and LHCP from the CPC and uses the taps with the updated tap weights “to modify the amplitude and/or phase of the RHCP and LHCP, to perform further equalization [and corrections].” Dkt. 83-6 ¶¶ 29, 34. Dr. Core knew that the RF satellite receive system had two AEs. Dkt. 83-3 ¶ 76. Dr. Core also knew “each [AE] had a ‘7 tap design’” to program the DSD algorithm. *See id*. ¶¶ 69, 76; *see also* Dkt. 65-28. Again, Dr. Core emphasizes that he did not know what errors the DSD algorithm was correcting in the AE but knew the DSD would correct the errors regardless of the cause. Dkt. 83-3 ¶ 79.

There is also no genuine dispute that the system described in the ’211 Patent uses similar components and techniques as the ones used in RF communication systems, including the one developed at TRW. Dr. Core states that his research for his thesis topic included looking “at literature in the radio-frequency field, to see if [he] could locate techniques or concepts that might have application in the fiberoptic field.” *Id*. ¶ 18. In 1994, Dr. Core concluded, as part of his thesis, that he could design a “practical and efficient” dual-polarization fiberoptic receiver system using a CPC/XPIC. *Id*. ¶¶ 22, 23. In October 1994, Dr. Core wrote the 1994 Paper detailing his DP fiberoptic receiver system, which explained that the CPC concept used in RF satellite receiver systems can be implemented in a fiberoptic receiver system by replacing the receive antennas with an optical receiver or “front-end.” *See* Dkt. 83-4, Ex. 12 at COREOPT0019591. Dr. Core reiterated that point in both the Thesis and in the paper he sent to Roxlo. *See* Dkt. 65-15 at COREOPT0017646; Dkt. 83-4, Ex. 13 at COREOPT0044707–4708; *see also* Dkt. 65-3 at 201:20–203:13. Finally, to convince Lucent to fund his attempt to commercialize his DP fiberoptic receiver system, Dr. Core asserted that he had “built microwave cross polarization interference cancelers for satellite links at work, so the XPIC concept has been proven,” and highlighted that the satellite and optical systems were the same “except that the optical front-end [in the optic system] is replaced by orthogonally polarized antennas and low noise amplifiers.” Dkt. 65-15 at COREOPT0017644. Dr. Core states that this was

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV19-2190 JAK (RAO)<br>SA CV20-1463 JAK (RAO)<br>SA CV20-1468 JAK (RAO) | Date | August 4, 2022 |
|---|---|---|---|
| Title | Core Optical Technologies, LLC v. Nokia Corporation et al<br>Core Optical Technologies, LLC v. ADVA Optical Networking SE et al<br>Core Optical Technologies, LLC v. Cisco Systems, Inc. et al | | |

"salesmanship," but does not meaningfully dispute that the two systems have many similarities, and does not address the similar statements made in his papers. Dkt. 83-3 ¶ 120.

The '211 Patent also supports a determination that the claimed invention has many similarities to TRW's RF communications system. The specification discloses that apart from the XPIC, the invention uses conventional hardware for fiberoptic receiver systems. *See* '211 Patent at 1:37–2:34 (describing "a conventional coherent fiber optic communication link" with a "receiver **100**" including "a pair of beam splitters **110** and **120**," two "double-balanced optical receivers (DBORS) **140** and **150**," a "local oscillator (LO) laser," and a "demodulator **170**"); Fig. 1. The specification also discloses that the invention can use "well-known" algorithms, such as the DSD algorithm. *See id*. at 8:26–31 ("One example of a well-known adaption procedure for these filters is the method of differential steepest descent"). Further, the specification discloses in one embodiment, the fiberoptic receiver device may operate "in conjunction with an electrical intermediate frequency (IF) XPIC," which uses electrical complex filters that "operate at microwave frequencies rather than optical frequencies." *Id*. at 10:27–36; *see also id*. at 13:45–47 (explaining that "the frequency response of the optical signal field polarization parameters [are] translated to the IF range by the downconversion process of DBORs **635** and **650**). Thus, in some embodiments of the '211 Patent, the XPIC corrects XPI in RF signals rather than optical signals, and as Dr. Core confirmed, the DSD algorithm would correct XPI regardless of what physical phenomena caused the errors. *See* Dkt. 65-3 at 246:14–247:25; 256:1–18.

Dr. Kahn's opinions regarding the relevant distinctions between TRW's CPC and the XPIC disclosed in the '211 Patent are either conclusory or directed to unclaimed features. Dr. Kahn explains that there are "only [two] significant differences between" the XPIC disclosed in the '211 Patent and TRW's CPC. Dkt. 83-6 ¶ 60. First, TRW placed the two "diagonal" or "equalizer" components, i.e., the AEs, outside of the CPC, which includes the two "non-diagonal" or "canceller" components. *Id*. ¶¶ 60, 63, 64, 78. Citing a 1986 prior art publication titled "Cross Polarization Interference Canceller for QAM Digital Radio Systems with Asynchronous Clock and Carrier Signals," by B. Lankl of Siemens AG ("the Lankl Paper"), Plaintiff and Dr. Kahn refer to this as the "C-E" or "canceller-equalizer" structure. *Id*. ¶¶ 63, 68 (citing Dkt. 83-7, Ex. 18 (the Lankl Paper); Dkt. 87-10, Ex. 18 (sealed version)). In contrast, Plaintiff and Dr. Kahn assert that the XPIC disclosed in the '211 Patent includes all four elements inside the CPC "in a single 2x2 butterfly structure," where "the [two equalizer/diagonal] and [two canceler/off-diagonal] elements operate in parallel," as depicted in Figures 4A and 4B of the '211 Patent. Dkt. 83-6 ¶¶ 60, 63; '211 Patent, Figs. 4A, 4B. Referencing the Lankl Paper again, Plaintiff and Dr. Kahn refer to this as the "PAR-structure." Dkt. 83-6 ¶ 64. Although Dr. Kahn asserts that there are "significant technical differences" between those two structures, he does not explain these "significant technical differences." *See id*. ¶ 79 (citing only the disclosure in the Lankl Paper that the two structures "interact quite different"). This testimony is insufficient to create a genuine dispute of material fact, particularly given Dr. Kahn's testimony that the equalizers and cancelers in both structures perform the same function. *See id*. ¶ 61 ("despite TRW's choice to place the [AEs] outside of the CPC, and the differences in the elements used to apply the filter weights …, the structures are otherwise the same, and they perform the same function of eliminating both cross-pol

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV19-2190 JAK (RAO)<br>SA CV20-1463 JAK (RAO)<br>SA CV20-1468 JAK (RAO) | Date | August 4, 2022 |
|---|---|---|---|
| Title | Core Optical Technologies, LLC v. Nokia Corporation et al<br>Core Optical Technologies, LLC v. ADVA Optical Networking SE et al<br>Core Optical Technologies, LLC v. Cisco Systems, Inc. et al | | |

distortion (in the CPC elements) and other distortion (in the AE elements)"); *Thornhill*, 594 F.2d at 738.[12]

Second, Dr. Kahn explains that TRW's CPC used "single-tap" CPC elements and "7-tap FIR filters within the AEs," while the '211 Patent XPIC uses "multi-tap filters" for all four elements. *Id.* ¶¶ 60, 65, 66, 78. Dr. Kahn opines that, because the multi-tap filters are frequency dependent, unlike the single-tap elements, which use frequency-independent coefficients, the '211 Patent XPIC can "correct for *both* cross-polarization interference *and* frequency-dependent effects" that result from optical transmission. *Id.* ¶ 80 (emphasis in original). However, Dr. Kahn also concedes that, "any POSITA reading Lankl would know that Lankl's C-E system could easily be modified by changing the multi-tap filters in the CPC to single-tap coefficients, in order to reduce complexity and save costs." *Id.* ¶ 71. Moreover, multi-tap filters are not part of any of the claims of the '211 Patent. *See* '211 Patent, Claims 1–37. None of the parties' constructions for the term "cross polarization interference canceler" require frequency-dependent filters. Further, the '211 Patent discloses that in some embodiments, the XPIC may use frequency independent solutions consisting of four complex elements using coefficients rather than filters. *See* Dkt. 77-1 at 13; '211 Patent at 3:36–38 ("FIG. **4B** is an exemplary embodiment of a frequency independent, optical XPIC comprised of four complex elements"), 6:59–63 ("These components would be applied as inputs to an optical XPIC, which would perform complex filtering *or* weighting and subsequent recombining of these inputs to mitigate [XPI].") (emphasis added); 9:1–6 (describing coefficients as complex elements for XPICs without frequency dependence), 21:48–51 ("frequency independent diagonalizer and MMSE XPIC solutions require that IF XPIC **670** consists of four (4) complex elements"), Fig. 4B, Claim 33 (claiming "mitigating cross polarization interference … using a plurality of matrix coefficients being complex values"); *see also* Dkt. 65-3 at 274:2–15.

Nevertheless, based on a review of all of this proffered evidence, there is a genuine dispute of material fact as to whether Dr. Core's Thesis, and, consequently, the '211 Patent, actually "result[ed] from" his work at TRW. Dr. Core asserts that he "did not use any information—let alone proprietary or trade secret information—that [he] learned at TRW to develop [his] optical XPIC invention." Dkt. 83-3 ¶ 85. There is no evidence that Dr. Core worked on fiberoptics at TRW, and Dr. Core states that he did not. *Id.* ¶ 18. Although Dr. Core had relevant background information about RF communication as a result of his work at TRW, Dr. Core states that he did not know that he could implement a system like the one on which he worked at TRW in a fiberoptic receiver when he began his Ph.D program. The present evidence supports the position that he was only able to determine that he could due to his research. Therefore, there is a genuine issue of fact as to whether the '211 Patent was the result of Dr. Core's independent research as

---

[12] Additionally, as Dr. Kahn notes, TRW chose the C-E structure not because there was any significant technical difference in the operation of the two structures, but because "customers could choose to include or omit the CPC and/or AEs depending on their requirements" by separating the CPC and AE elements. Dkt. 83-6 ¶ 61. Further, although Plaintiff's alternative proposed construction for the term "cross polarization interference canceler" includes "elements or filters having the 2x2 butterfly structure in Figs. 4A or 4B," Plaintiff's principal, proposed construction does not include those elements. *See* Dkt. 77-1 at 13–14 (proposing the following construction: "circuitry, optical components, and/or associated software to reconstruct two signals that were optically transmitted with generally orthogonal polarization states to mitigate, at least, XPI").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV19-2190 JAK (RAO)<br>SA CV20-1463 JAK (RAO)<br>SA CV20-1468 JAK (RAO) | Date | August 4, 2022 |
|---|---|---|---|
| Title | Core Optical Technologies, LLC v. Nokia Corporation et al<br>Core Optical Technologies, LLC v. ADVA Optical Networking SE et al<br>Core Optical Technologies, LLC v. Cisco Systems, Inc. et al | | |

or as a result of his work at TRW.

Accordingly, there is a genuine dispute of material fact whether the '211 Patent "result[ed] from" Dr. Core's work for TRW. Because Defendants have not shown that there is no dispute of material fact as to both the "relate to" and "result from" elements, Defendants' arguments regarding whether Dr. Core developed the '211 Patent on his own time and with his own supplies are considered. Defendants' argument that Dr. Core's work during his Ph.D program was work for TRW is also considered in addressing whether Dr. Core's work was during TRW time below.

> c)    Defendants Have Not Shown that TRW Supplies Were Used in the Invention Process

Defendants assert that Dr. Core used TRW supplies, i.e., its funding, to develop the '211 Patent. Dkt. 65 at 19–20 (citing Dkt. 65-3 at 69:17–70:6, 70:25–71:9, 74:21–75:2, 75:7–17, 96:23–97:4; Dkt. 64-3 (sealed version); Dkt. 65-24 ¶¶ 7,8). Defendants argue that Dr. Core's Ph.D work fell within the scope of his TRW employment, citing *Dimmig v. Workmen's Comp. Appeals Bd.*, 6 Cal.3d 860, 862, 865–66 (Cal. 1972). *Id*. Defendants also argue that *Cubic Corp.* is "instructive because the employee there developed necessary circuity "under a Cubic funded program." *Id*. at 19 (quoting *Cubic*, 185 Cal.App.3d at 452–453).

Plaintiff responds that there is no legitimate dispute that Dr. Core did not use any "physical TRW 'equipment,' 'supplies,' or 'facilities,' or any TRW trade secrets, in conceiving his invention." Dkt. 83 at 14 (citing Dkt. 83-3 ¶¶ 87–96). Plaintiff argues that accepting Defendants' argument that "funding" constitutes "supplies" under the Agreement would mean that any employee who used his or her salary to develop an invention would have to assign that invention to the employer. *Id*. at 15. According to Plaintiff, that "would effectively nullify Section 2870 of the California Labor Code, on which Paragraph 9 is based, for any employee who receives a monetary benefit from his or her employer—which is any employee." *Id*. Plaintiff contends that Defendants offer no support for their argument. *Id*. Plaintiffs also contend that *Applera* confirms that funding is not "supplies" because the Federal Circuit found that the employee did not use company "supplies" despite having received a salary. *Id*. at 16 (citing *Applera*, 375 F. App'x at 15).

Plaintiff argues that TRW's reliance on *Cubic Corp.* and *Dimmig* is misplaced. *Id*. at 16–17. Plaintiff asserts that *Cubic Corp.* is distinguishable because the employee there required assistance from Cubic employees. *Id*. at 16–17 (emphasis in original) (citing *Cubic Corp.,* 185 Cal. App. 3d at 453–55). Plaintiff argues that *Dimmig* is distinguishable because it is a workers compensation case and only found that compensation for an employee's night classes "'must be considered as additional compensation' that 'comes within the course of his employment' for purposes of workers compensation." *Id*. (citing *Dimmig*, 6 Cal.3d at 863, 866).

Defendants reply that "TRW supplied the resources that made Core's doctoral studies possible," i.e., TRW's funding. Dkt. 88 at 4. Defendants assert that to hold otherwise would award the '211 Patent to Dr.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV19-2190 JAK (RAO)<br>SA CV20-1463 JAK (RAO)<br>SA CV20-1468 JAK (RAO) | Date | August 4, 2022 |
|---|---|---|---|
| Title | Core Optical Technologies, LLC v. Nokia Corporation et al<br>Core Optical Technologies, LLC v. ADVA Optical Networking SE et al<br>Core Optical Technologies, LLC v. Cisco Systems, Inc. et al | | |

Core, who "actively seeks and obtains company funding to refine his invention, [and] uses company time and funding to develop his invention while all the time secretly intending to take out a patent on the invention for himself." *Id*. (quoting *Cubic Corp*. 185 Cal. App. 3d at 453). Defendants also contend that *Applera* is distinguishable because the inventor did not rely on "an employer-supplied resource as [Dr. Core] did here." *Id*. at 5.

Defendants' argument that funding qualifies as "supplies" under the Agreement is unpersuasive. As Plaintiff has argued, accepting Defendants' position would mean that any employee who spent his or her salary developing an invention would need to assign that invention to the employer. No court has accepted Defendants' interpretation, and *Applera* upheld a jury verdict finding that an employee did not use any company supplies despite receiving a salary while developing his invention and purchasing a laboratory notebook presumably with that salary. *See Applera*, 375 F. App'x at 15–16. Accordingly, Defendants have not shown the absence of a material fact as to whether Dr. Core used TRW "supplies" during the inventive process.

> d)     There is No Dispute of Material Fact That Dr. Core Developed the '211
> Patent on TRW Time

Defendants assert that Dr. Core developed the '211 Patent on TRW's time because he did so during his Ph.D program, that TRW funded. Dkt. 65 at 17–18. Thus, according to Defendants, any work that Dr. Core performed during his Ph.D program would have been on TRW's time, not his own. *See id*. Defendants also argue that Dr. Core's time spent during his Ph.D studies was TRW's time because "TRW made that investment expecting to benefit from the Fellowship participant's advanced education." *Id*. at 18. Defendants contend that *Cubic Corp*. is instructive because the court there found that employee "did not develop the invention entirely on his on time since he used [his employer's] personnel **and funding** to add circuitry which was necessary to make his invention work." *Id*. at 18 (emphasis in original) (quoting *Cubic Corp*., 185 Cal.App.3d at 453).

Plaintiff responds that Dr. Core's work during his Ph.D studies was his own time, not that of TRW. Dkt. 83 at 17–19. Plaintiff argues that there is no evidence that Dr. Core was required to assign any invention that was created as part of his Ph.D studies, and that Defendants' interpretation would "render the TRW Invention Agreement inapplicable to TRW Fellowship recipients," in violation of § 2870. *Id*. at 18. Specifically, Plaintiff asserts that "California enacted Labor Code § 2870 precisely to ensure that employers could **not** claim ownership of inventions that employees developed outside working hours." *Id*. at 19 (emphasis in original). Plaintiff also argues that TRW paid for Dr. Core's Ph.D studies "in exchange for Dr. Core's ***commitment to remain with TRW*** for one year after receiving his degree," and that reiterates that *Cubic Corp*. is distinguishable because the employee there required assistance from Cubic employees. *Id*. at 18–19 (emphasis in original) (citing *Cubic Corp.,* 185 Cal. App. 3d at 452–53).

Defendants reply that it is irrelevant that Dr. Core did not work on his invention at his place of employment

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV19-2190 JAK (RAO)<br>SA CV20-1463 JAK (RAO)<br>SA CV20-1468 JAK (RAO) | Date | August 4, 2022 |
|---|---|---|---|
| Title | Core Optical Technologies, LLC v. Nokia Corporation et al<br>Core Optical Technologies, LLC v. ADVA Optical Networking SE et al<br>Core Optical Technologies, LLC v. Cisco Systems, Inc. et al | | |

with TRW because he still did so on time for which he was paid by TRW. Dkt. 88 at 2. Citing *Dimmig*, 6 Cal.3d at 862, 868, Defendants assert "that an employee is acting 'in the course of his employment' when 'the employee engages in a special activity which is within the course of his employment, and which is reasonably undertaken at the request or invitation of the employer.'" *Id*. Defendants contend that Dr. Core was invited to participate in the TRW Fellowship program and therefore, his studies were on TRW's time. *Id*. (citing Dkt. 83-3 ¶ 12). Defendants also argue that "a 2005 document, which reflect[s] the policies during Core's Fellowship," states that the "Invention Agreement signed at the time of employment . . . will remain in force during the entire fellowship." *Id*. at 3 (citing Dkt. 88-6 at NGC_0001153; Dkt. 90-2 (sealed version)). Finally, Defendants argue that Dr. Core received full employment benefits during his Fellowship despite being a part-time employee and would be required to reimburse TRW for its expenditure had he not continued to work for TRW for at least 12 months after his graduation. *Id*. (citing Dkt. 65-24 ¶ 7; Dkt. 88-6 at NGC_0001150; Dkt. 88-7 at NGC_0001364; Dkt. 90-3 (sealed version)).

The '211 Patent was not "developed entirely on [Dr. Core's] own time." The analysis in *Dimmig* is instructive. *Dimmig* reversed the decision of the Workmen's Compensation Appeals Board , which denied worker's compensation for an employee who was killed while returning home from night college classes. It did so based on the finding that the employee was acting in the course of his employment when he died. *Dimmig*, 6 Cal.3d at 860, 862. The employee was a contracts administrator "attending night classes at Notre Dame College in order to obtain a bachelor's degree in economics." *Id*. at 862. The employer "had established a policy of encouraging its employees to attend college and, upon successful completion of a particular course, [the employer] would reimburse the entire cost of tuition and books for courses directly related to the employee's job and 50 percent of such costs for courses not directly related to the job but required for the degree being sought." *Id*. *Dimmig* found that the participation in the night classes came within the course of employment because the employer encouraged the employee to take the classes, paid for the classes, and directly benefitted from the employee's improved "ability to perform his assigned tasks more effectively." *Id*. at 865–66.

*Dimmig* also held that the employee's drive to and from his classes came within the course of his employment under the "special mission doctrine" exception to the "coming and going rule," which bars worker's compensation for "an injury which occurs while an employee is driving to or from work." *Id*. at 866–69. After analyzing California case law, *Dimmig* stated the "special mission" exception as follows: "when the employee engages in a special activity which is within the course of his employment, and which is reasonably undertaken at the request or invitation of the employer, an injury suffered while traveling to and from the place of such activity is also within the course of employment and is compensable." *Id*. at 688. *Dimmig* found that the employee's attendance at the night classes was a "special activity" "because it was not a part of his normal routine as a contracts administrator," and "was undertaken at the request or invitation of his employer" because the employer reimbursed the employee for expenses incurred through participation in the classes. *Id*. at 689.

Although *Dimmig*'s "course of employment" analysis arose in the context of a worker's compensation case, the policy rationale stated in *Cubic Corp*. justifies adopting a similar analysis here. *Cubic Corp*.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV19-2190 JAK (RAO)<br>SA CV20-1463 JAK (RAO)<br>SA CV20-1468 JAK (RAO) | Date | August 4, 2022 |
|---|---|---|---|
| Title | Core Optical Technologies, LLC v. Nokia Corporation et al<br>Core Optical Technologies, LLC v. ADVA Optical Networking SE et al<br>Core Optical Technologies, LLC v. Cisco Systems, Inc. et al | | |

found that substantial evidence supported the conclusion that an employee did not develop an invention on his own time because "he used [the employer's] personnel and funding to add circuitry which was necessary to make his invention work." *Cubic Corp.*, 185 Cal.App.3d at 453. Specifically, the employer in *Cubic Corp.* "funded an internal project to study [the employee's] invention" after the employee "represent[ed] it might be a new product" for the employer. *Id.* at 444–45. *Cubic Corp.* then concluded that "we do not think the Labor Code provisions were intended to award an invention to an employee who presents an invention to an employer, represents the invention is for the employer's benefit, actively seeks and obtains company funding to refine his invention, uses company time and funding to develop his invention while all the time secretly intending to take out a patent on the invention for himself." *Cubic Corp.*, 185 Cal.App.3d at 453. Thus, like in *Dimmig*, the employee actively sought out the funding from the employer to participate in the program, the employer funded the employee's participation, and the employer benefited from that participation.

Dr. Core's participation in TRW's Fellowship Program was similar, i.e., during the course of his employment for TRW, and therefore, during what was TRW's time. Dr. Core applied to TRW's Fellowship Program. Dkt. 83-3 ¶ 10. After accepting Dr. Core into the Fellowship Program, TRW paid the entire cost of his tuition and a stipend to Dr. Core, and Dr. Core received the benefits of a full-time employee while pursuing his Ph.D despite working part-time at TRW. Dkt. 83-1 ¶¶ 22 ("[Plaintiff] does not dispute that TRW paid Dr. Core's tuition"), 24 ("Undisputed" that "Fellowship participants also continued to receive benefits like medical insurance, sick pay, and time accrual toward their pension, while they pursued their education"), 25 ("[Plaintiff] admits that Dr. Core received a stipend during the times that he was working a reduced schedule at TRW."). Dr. Core's work during the Ph.D program related to TRW's business as well as his role as an engineer at TRW, and Dr. Core was "expected to contribute at TRW using [his] newly gained education and [was] required to stay with the company for one year after receiving [his] degree." *See* Section III.B.2.b.(2); Dkt. 83-1 ¶ 27; Dkt. 83-2 ¶ 112 (agreeing that Dr. Core's role was related to his job responsibilities).

Under *Dimmig*, Dr. Core's participation in the TRW Fellowship Program would be during the course of his employment. Plaintiff provides no reason why Dr. Core's participation should qualify as TRW time for the purposes of worker's compensation but not for the Agreement.

\*       \*       \*

Because the '211 Patent does not satisfy the second requirement of the Non-TRW Invention Clause of the Agreement, the '211 Patent is not a Non-TRW Invention and Dr. Core was required to assign the '211 Patent to TRW.

3.    The Agreement Automatically Assigned the '211 Patent to TRW

The parties dispute whether the Agreement automatically assigned the '211 Patent to TRW. Defendants argue that through the language "shall and **do[es] hereby assign**," the Agreement automatically

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV19-2190 JAK (RAO)<br>SA CV20-1463 JAK (RAO)<br>SA CV20-1468 JAK (RAO) | Date | August 4, 2022 |
|---|---|---|---|
| Title | Core Optical Technologies, LLC v. Nokia Corporation et al<br>Core Optical Technologies, LLC v. ADVA Optical Networking SE et al<br>Core Optical Technologies, LLC v. Cisco Systems, Inc. et al | | |

assigned the '211 Patent to TRW because it "expressly grants rights in future inventions." Dkt. 65 at 15–16 (emphasis in original) (quoting Dkt. 65-5 at COREOPT0007678; *DDB Techs.*, 517 F.3d at 1290) (citing *Filmtec Corp. v. Allied-Signal, Inc.*, 939 F.2d 1568, 1570–72 (Fed. Cir. 1991)).

Plaintiff responds that *FilmTec* should not apply because the dissenting opinion in *Bd. of Trustees of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.* "criticized *FilmTec* as 'contrary to the intention of the parties.'" Dkt. 83 at 25 (quoting 131 S. Ct. 2188, 2203 (2011) (Breyer, J., dissenting). Additionally, Plaintiff argues that "because *FilmTec* post-dated Dr. Core's 1990 Invention Agreement, pre-*FilmTec* law should apply, and there is no 'automatic assignment.'" *Id*.

Defendants reply that "dissents carry no legal force." Dkt. 88 at 10 (quoting *Georgia v. Pub. Res. Org, Inc.*, 140 S.Ct. 1498, 1511 (2020)). Additionally, Defendants argue that courts have continued to apply *FilmTec*, including to agreements pre-dating that decision. *Id*. (citing *Grail Semiconductor v. Renesas Elecs. America Inc.*, No. 11-3847 JCS, 2012 WL 12920690, at *8–9 (N.D. Cal. Sept. 18, 2012); *Venture Corp. v. Barrett*, No. 13-3384 PSG, 2015 WL 8479475, at *4 (N.D. Cal., Dec. 9, 2015); *Imatec, Ltd. v. Apple Computer, Inc.*, 81 F.Supp.2d 471 (S.D.N.Y. 2000), *aff'd*, 15 Fed. App'x 887 (Fed. Cir. 2001)).

The language in the Agreement automatically assigned the '211 Patent to TRW. The language in the Agreement is identical to the language in *FilmTec*, which remains binding. *See Georgia*, 140 S.Ct. at 1511; *c.f. Roche* Molecular, 131 S. Ct. at 2203 (Breyer, J., dissenting) (stating the *FilmTec* rule should not apply "where the Bayd-Dole Act is at issue"). Further, Plaintiff cites no authority that *FilmTec* only applies to agreements post-dating the decision, and Defendants have cited one decision to the contrary. *See Imatec, Ltd. v. Apple Computer, Inc.*, 15 Fed. App'x 887 (Fed. Cir. 2001) (finding that *FilmTec* applied to agreement pre-dating *FilmTec* decision). Defendants position is more persuasive on this legal issue.

For the foregoing reasons, Dr. Core automatically assigned his rights to the '211 Patent under the terms of the Agreement.

IV.    <u>Conclusion</u>

Defendants have shown there is no genuine dispute of material fact the '211 Patent is not a Non-TRW Invention under the Agreement. Under the language of the Agreement, Dr. Core automatically assigned his rights in the '211 Patent to TRW. Accordingly, Dr. Core does not own the rights to the '211 Patent and thus lacks standing to assert the '211 Patent. Therefore, Defendants' Motion is **GRANTED**. After meeting and conferring with counsel for Plaintiff to determine if there is an agreement as to the form of the judgment, Defendants shall file a proposed judgment within 14 days of the issuance of this Order, that should be signed by Plaintiff's counsel if there is an agreement as to its form. If there is a dispute as to the form of the proposed judgment, Plaintiff shall file any objections within 10 days after the proposed judgment is lodged, and in conformance with the Local Rules.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV19-2190 JAK (RAO)<br>SA CV20-1463 JAK (RAO)<br>SA CV20-1468 JAK (RAO) | Date | August 4, 2022 |
|----------|---------------------------------------------------------------------------|------|----------------|
| Title | Core Optical Technologies, LLC v. Nokia Corporation et al<br>Core Optical Technologies, LLC v. ADVA Optical Networking SE et al<br>Core Optical Technologies, LLC v. Cisco Systems, Inc. et al | | |

_____ :  _____

Initials of Preparer     TJ